**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                                  :

NICOLE COSTIN, individually and on behalf of   :
her minor son, BABY A,                           :
                                                  :
                        Plaintiff,                :
                                                  :
                  -against-              :      Case No.  1:22-cv-00296 (MAD/CFH)
                                                   :

GLENS FALLS HOSPITAL, KEVIN M.          :      **FIRST AMENDED COMPLAINT**
GRASSI, M.D., STACY L. RALPH, KAREN     :      **AND JURY DEMAND**
RANTTILA, LYNETTE M. BISS, NICOLE      :
BENNETT, JENNIFER NIX, AMY HOOPER,   :
JODIE SMITH, STEPHANIE DECHENE, and   :
ALYCIA N. GREGORY.                     :
                                                   :
                         Defendants.              :
-------------------------------------------------------------x

           Plaintiff Nicole Costin ("Ms. Costin" or "Plaintiff"), both individually and on

behalf of her minor son, "Baby A," by and through their attorneys, Schulte Roth & Zabel LLP, in

their Complaint against Defendants Glens Falls Hospital ("GFH"), Kevin M. Grassi, M.D.

("Dr. Grassi"), Stacy L. Ralph, R.N. ("Nurse Ralph"), Karen Ranttila, R.N. ("Nurse Ranttila"),

Lynette M. Biss, C.N.M. ("Nurse Midwife Biss"), Nicole Bennett, C.N.M.,

("Nurse  Midwife  Bennett"), Jennifer Nix, R.N. ("Nurse Nix"), Amy Hooper, R.N.

("Nurse Hooper"), Jodie Smith, R.N. ("Nurse Smith"), Stephanie Dechene, LCSW-R

("Social Worker Deschene"), and Alycia N. Gregory, LMSW ("Social Worker Gregory")

(collectively, the "Defendants"),[1] hereby allege as follows:

---

[1]       Plaintiff relied upon documents and information provided by GFH and Dr. Grassi pursuant to Federal Rule
of Civil Procedure 26(a)(1) to identify the individually-named defendants.  Plaintiff reserves the right to seek further
amendment to correct any of the individual defendants' names, should that be necessary.

## NATURE OF THE ACTION

1.      This is a case about discrimination and obstetric violence.  In its simplest terms, the Defendants, including GFH and its employees, discriminated against Ms. Costin throughout her entire birthing experience by denying her equal services, privileges, and accommodations because she is a disabled person.  Through their actions and inactions, the Defendants maliciously and unlawfully inflicted physical and mental harm, and long-lasting trauma, upon Ms. Costin and Baby A.  GFH became aware of Ms. Costin's disability (a substance abuse disorder) when she disclosed her treatment medication, Subutex, upon her admission to the hospital to give birth to Baby A.  From that moment onwards, GFH treated Ms. Costin more like a criminal than a patient.  The hospital treated both Ms. Costin and Baby A as if they had no freedoms or rights and denied them equal access to the services GFH represents that it provides its patients.

2.      Ms. Costin and her partner, Solomon Gonzalez ("Mr. Gonzalez"), chose to deliver and welcome their son into the world at GFH.  Ms. Costin had previously been a patient at GFH, having received at least two surgeries there and being admitted through its emergency room on at least one occasion.  GFH is the only hospital within a reasonable distance of her home.  Ms. Costin entrusted GFH to ensure a safe, healthy, and lawful delivery, as it markets itself to do for expectant mothers who live in the Glens Falls area.  Instead, GFH turned what was supposed to be a joyous occasion into a real-life nightmare.

3.      The hospital performed tests and procedures on Ms. Costin and Baby A without Ms. Costin's informed consent and, in some cases, against her will, which GFH employees later admitted was the hospital policy when dealing with patients who, like Ms. Costin, suffer from substance abuse disorder.  Its employees treated Ms. Costin with contempt and disrespect while,

during contractions, she was suffering from immense pain and temporary losses of

consciousness, sight, and hearing.  They ignored Ms. Costin's pleas for her planned epidural

injection.  And, after they unilaterally decided to withhold the epidural, they induced labor

against her wishes and without her informed consent.  They injected her with drugs that she

explicitly refused and stood idly by while a nurse midwife, with the assistance of a student nurse

midwife, violently sewed up her vaginal area over her objections and pleas to stop.  The hospital

staff then prevented Ms. Costin from having skin-to-skin contact with, and from breastfeeding,

Baby A.  They also confined Ms. Costin and Baby A to their hospital room, after Ms. Costin had

asked to leave what she had expressed felt like a "prison" that — as documented by GFH — she

"wanted to get out of."

       4.     The Defendants' purported justification for their maltreatment of Ms. Costin and

Baby A?  A urine screening test that GFH claims tested positive for illicit drugs.  That test,

which was quickly contradicted and disproven by a second drug test taken at Ms. Costin's

insistence — and later by multiple additional tests of samples GFH took from both Ms. Costin

and Baby A — was used by the Defendants to criminalize Ms. Costin and rob both her and Baby

A of the safe, healthy, and informed patient experience that GFH advertises it affords its patients

and that GFH is obligated, by law, to provide.  Even assuming, *arguendo*, that the initial drug

screening test was accurate, it would not have justified the Defendants' conduct.

       5.     The Defendants' actions and inactions violate federal anti-discrimination laws,

state statutes, and common law.  Ms. Costin and Baby A are traumatized.  They have suffered,

and continue to suffer, physical, and psychological harm.  Ms. Costin wants to ensure that the

Defendants are held accountable and are deterred from ever causing another patient the same

trauma and damage that she and her newborn baby endured.[2]  Ms. Costin also wants GFH to make the changes necessary so that herself, her children, or her partner never again experience such discrimination by their neighborhood hospital, to which they inevitably will have to return.

**THE PARTIES**

6.      Plaintiff Ms. Costin is a natural person residing in Queensbury, New York.

7.      Plaintiff Baby A is a natural person residing in Queensbury, New York.  He is Ms. Costin's minor child.

8.      Upon information and belief, Defendant Glens Falls Hospital is a non-profit community hospital organized under New York State law with its principal place of business at 100 Park Street in Glens Falls, New York.  At all relevant times, GFH was operating by and through its duly authorized agents, employees, and/or assignees, who were acting within the scope of their employment and in accordance with the customs, practices, and policies of GFH. GFH is a place of public accommodation pursuant to New York State Human Rights Law, Executive Law § 292.

9.      Upon information and belief, Defendant Dr. Grassi is a physician licensed to practice medicine in the State of New York.  During the time period relevant to this proceeding, he was employed by GFH and provided services to Baby A.

---

[2]      GFH's discrimination against pregnant women with opioid abuse disorder is likely widespread.  According to New York State's Department of Health, the rate of buprenorphine (the generic name for Suboxone/Subutex) prescription for opioid use disorder in Warren County (where Ms. Costin lives and GFH is located) was significantly higher than the rates statewide.  Specifically, 946.1 per 100,000 population of patients in Warren County received at least one buprenorphine prescription for opioid use disorder versus 408.7 per 100,000 population of patients statewide.  *See New York State Opioid Data Dashboard - County Level: Warren County,* N.Y.S. Dep't of Health, https://webbi1.health.ny.gov/SASStoredProcess/guest?_program=%2FEBI%2FPHIG%2Fapps%2Fopioid_dashboard%2Fop_dashboard&p=ch&cos=52 (last visited June 22, 2022).

4

10.     Upon information and belief, Defendant Nurse Ralph is a Registered Nurse licensed to practice nursing in the State of New York.  During the time period relevant to this proceeding, she was employed by GFH and provided services to Ms. Costin and/or Baby A.

11.     Upon information and belief, Defendant Nurse Ranttila is a Registered Nurse licensed to practice nursing in the State of New York.  During the time period relevant to this proceeding, she was employed by GFH and provided services to Ms. Costin and/or Baby A.

12.     Upon information and belief, Defendant Nurse Midwife Biss is a Certified Nurse Midwife licensed to practice as a nurse midwife in the State of New York.  Nurse Midwife Biss is an employee of Hudson Headwaters Health Network ("HHHN") located at 90 South Street Glens Falls, New York, 12801.  During the time period relevant to this proceeding, she provided services to Ms. Costin at GFH.

13.     Upon information and belief, Defendant Nurse Midwife Bennett is a Certified Nurse Midwife licensed to practice as a nurse midwife in the State of New York.  Nurse Midwife Biss is an employee of HHHN located at 90 South Street Glens Falls, New York, 12801.  During the time period relevant to this proceeding, she was a Student Nurse Midwife who provided services to Ms. Costin at GFH.

14.     Upon information and belief, Defendant Nurse Nix is a Registered Nurse licensed to practice nursing in the State of New York.  During the time period relevant to this proceeding, she was employed by GFH and provided services to Ms. Costin and/or Baby A.

15.     Upon information and belief, Defendant Nurse Hooper is a Registered Nurse licensed to practice nursing in the State of New York.  During the time period relevant to this proceeding, she was employed by GFH and provided services to Ms. Costin and/or Baby A.

16.     Upon information and belief, Defendant Nurse Smith is a Registered Nurse licensed to practice nursing in the State of New York.  During the time period relevant to this proceeding, she was employed by GFH and provided services to Ms. Costin and/or Baby A.

17.     Upon information and belief, Defendant Social Worker Deschene is a Licensed Clinical Social Worker licensed in the State of New York.  During the time period relevant to this proceeding, she was employed by GFH and provided services to Ms. Costin and/or Baby A.

18.     Upon information and belief, Defendant Social Worker Gregory is a Licensed Clinical Social Worker licensed in the State of New York.  During the time period relevant to this proceeding, she was employed by GFH and provided services to Ms. Costin and/or Baby A.

## JURISDICTION AND VENUE

19.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Title III of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12133 and Section 504 of The Rehabilitation Act, 29 U.S.C. § 794.  The Court also has pendant jurisdiction over certain claims.

20.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).  The acts and omissions giving rise to this action occurred in the Northern District of New York.

## FACTUAL ALLEGATIONS

**Ms. Costin Plans to Give Birth at GFH.**

21.     An expectant mother must make the very important decision of where to give birth to her expected child.  It is no secret that, when selecting a hospital for the delivery, expectant mothers consider the safety, care, and comfort that the hospital (and its attending nurses, physicians, and other agents) promises to provide.

22.     Ms. Costin chose to deliver her child at GFH.  She had previously received services at GFH on multiple occasions, and it is the only hospital within a 15-mile radius of her home.  GFH touts itself as the "Best Childbirth Center in the Adirondacks."  Its website is rife with statements and representations that would lead any expectant mother to believe her birthing experience at the hospital would be a positive one.  The hospital represents that its "patients are everything."  It also states that its maternity ward, the Joyce Stock Snuggery (the "Snuggery"), "was the setting for more than 41,000 births" and that "[e]ach" of those births "received the same outstanding, personalized care the Snuggery has become synonymous with."  The hospital states that its "primary concern … is the comfort and safety of our patients and visitors" and that it "strive[s] to make [its patients'] visit as comfortable and convenient as possible."

23.     Ms. Costin relied on those representations.  She only wishes they were true.

**Ms. Costin Arrives to GFH's Snuggery.**

24.     On March 29, 2021, at around 12:30 p.m., Ms. Costin felt her water break.  She was 38.5 weeks pregnant.  She immediately reached out to Hudson Headwaters Health Network Women's Health (an entity that works with GFH to provide midwives during delivery at GFH).  She was instructed to go to the Snuggery at GFH.  Ms. Costin, accompanied by her partner, Mr. Gonzalez, checked into the GFH Snuggery at approximately 2:00 p.m.  They were full of excitement.  Their newborn would be Mr. Gonzalez's first child and Ms. Costin's second.  Ms. Costin's other son, who was eight years old at the time, stayed home with Ms. Costin's mother, anxiously awaiting the birth of their newest family member.

25.     Ms. Costin had meticulously planned for this birth.  She attended all of her prenatal appointments, continued treatment for her substance abuse disorder, ensured that all of her prescription medications were safe for the baby in utero, and discussed the details of her

birthing plan with her medical providers.  Her plan was simple:  she would deliver at GFH,

Mr. Gonzalez would be in the delivery room with her (GFH had a COVID-related policy at the

time that permitted only one additional person in the delivery room), she would deliver

vaginally, and *most importantly*, she would be given an epidural injection.  The epidural was of

critical importance to Ms. Costin due to her experiences during the delivery of her first child (at a

different hospital).[3]  Ms. Costin was confident that, with her birthing plan in place, she would

have the smoothest and safest birthing experience possible at GFH.

26.     When Ms. Costin checked into her hospital room, she was met by Nurse Ralph.

To Ms. Costin's surprise, Nurse Ralph entered Ms. Costin's room singing out, "I'm here for the

beer!"  Nurse Ralph was accompanied by a student nurse.  Ms. Costin informed Nurse Ralph

that, while the student nurse was welcome to observe, she did not want, and did not consent to,

the student nurse (or any other student practitioner) performing any medical examinations or

procedures on her or Baby A.  This was of critical importance to Ms. Costin, as she had a

negative experience with a student nurse during the delivery of her first child.  She was adamant

that no procedures be performed by a student in any capacity.

27.     Nurse Ralph then asked Ms. Costin seemingly routine questions about her

personal and medical history.  Among other questions, she asked if Ms. Costin was experiencing

domestic violence in the home, to which Ms. Costin responded, "No."  She also asked

Ms. Costin about any history of tobacco use.  Ms. Costin similarly responded in the negative.

Unbeknownst to Ms. Costin at the time, Nurse Ralph disregarded Ms. Costin's responses and

---

[3]      Ms. Costin suffered from Oligohydramnios during her pregnancy with her first child, a medical condition characterized by a deficiency of amniotic fluid, for which she required specialized prenatal care at a medical facility 40 miles away from home.  During her final prenatal visit at that facility, she was directed to go immediately to the closest hospital to give birth.  Absent those circumstances, Ms. Costin would have delivered her first child at her local hospital, GFH.

indicated in her medical records that Ms. Costin engaged in "maternal tobacco use."  During this conversation, Ms. Costin reiterated her birthing plan and stressed the most important component — that she wanted an epidural to be administered during labor.

28.    Nurse Ralph also asked Ms. Costin what medications she was taking.  Ms. Costin informed her that she was taking 8 milligrams of Subutex twice a day, which was prescribed by her primary care physician for her disability.  Subutex is a treatment medication for individuals with certain disabilities, including substance abuse disorder.  Ms. Costin had previously been taking Suboxone, a different form of Subutex, for more than a decade.  Upon learning of her pregnancy, her doctor changed her prescription to Subutex, which is safer for pregnant women and their unborn children.

29.    Ms. Costin's substance abuse disorder is a disability under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act.  When untreated, Ms. Costin's addiction to opioids substantially impairs her major life activities.  When untreated, she is unable to care for herself, and her physical and mental functioning are substantially limited.  Ms. Costin's opioid addiction has led to multiple arrests, incarcerations, and abusive relationships.  When off of her medication, she has had hallucinations, suffered from paranoia, and experienced severe anxiety and panic attacks.  Because of her debilitating substance abuse disorder, Ms. Costin has participated in extensive rehabilitation and has received treatment for more than 10 years under the close supervision of her primary care physician.  Although she still has substance abuse disorder and still requires treatment, Ms. Costin is no longer using illicit opioids.

30.    Ms. Costin did not hesitate to inform Nurse Ralph that she was prescribed Subutex, even though the disclosure would reveal her as being addicted to opioids, because GFH prides itself on treating *all* patients, including those with a disability, with equality and respect.

9

Further, as GFH is surely aware, individuals who, like Ms. Costin, take a legally-prescribed medication to treat substance use disorder (such as Suboxone or Subutex) and who, like Ms. Costin, are no longer using illegal substances, are considered to be persons with a "disability," and are protected by the ADA and the Rehabilitation Act. Thus, even putting aside GFH's own representations, GFH was required, by federal law, to treat and service Ms. Costin equally to its other patients, regardless of her disability.

**GFH Tests Ms. Costin's Urine for Illicit Drugs Without Her Informed Consent.**

31. At around 7:00 p.m., the Snuggery unit had a shift change. Nurse Ralph met with the incoming nurse, Nurse Ranttila, and updated her with information about Ms. Costin. One of the first pieces of information she shared was the fact that Ms. Costin was taking Subutex.

32. Nurse Ralph also told Nurse Ranttila that GFH was awaiting the results of a urine toxicology screen. That came as a surprise to Ms. Costin. Ms. Costin had provided Nurse Ralph with a urine sample, but she assumed it was for the same reasons she had provided urine samples during prenatal examinations, *i.e.*, to check the levels of sugar and protein in her urine. No one had informed Ms. Costin that the hospital was performing a drug test on her urine. Nor, to her knowledge, did she consent to any such test.

33. Ms. Costin made a mental note of this but was not particularly concerned because she knew that she was not an illicit drug user. Also, she was distracted by painful contractions. Her contractions continued during Nurse Ranttila's shift and became increasingly painful. The contractions were so intense that Ms. Costin went in and out of consciousness and temporarily lost her sight and hearing. One contraction was so painful that Ms. Costin, who was in the bathroom at the time, dropped to the floor. Although the contractions were excruciating, Ms. Costin understood that they were sufficiently spaced out in time such that birth was not imminent. She asked Nurse Ranttila to prepare her epidural shot. Nurse Ranttila informed

Ms. Costin that the hospital's anesthesiologist was on call and that she would contact him to get

the epidural process started.  Throughout Nurse Ranttila's shift, Nurse Midwife Biss and

Nurse Midwife Bennett periodically entered Ms. Costin's hospital room to check her dilation.

34.     Over the next hour, Ms. Costin's contractions intensified as she awaited the

epidural.  Nurse Ranttila told Ms. Costin that she had called the anesthesiologist and that he was

in the hospital building.  In the midst of this, Nurse Midwife Bennett (then, a student nurse

midwife) entered Ms. Costin's hospital room and blurted out:  "Your urine test came back with

positive results for both cocaine and PCP."  Ms. Costin immediately informed everyone in the

room that the positive results were wrong, she did not take cocaine or PCP during her pregnancy,

and the hospital must have made an error in the lab or tested the wrong patient's urine.  She

asked Nurse Ranttila to immediately redo the urine test or test her blood if that would ensure

accuracy.

35.     Ms. Costin continued to beg Nurse Ranttila for her epidural, but her pleas were

ignored.  Ms. Costin was in pain, distressed, and in complete shock that GFH was refusing to

treat her in accordance with her pre-determined birthing plan.  Amid Ms. Costin's protests of the

drug screening results and demands for the epidural, Nurse Ranttila collected additional urine to

conduct a second drug screening test.  While doing so, Nurse Ranttila smirked and asked Ms.

Costin, "Are you sure you didn't do cocaine before coming in?"  ***Nurse Ranttila also informed***

***Ms. Costin that, despite Ms. Costin informing her that she never consented to an initial drug***

***screen, GFH drug tests pregnant women who take Suboxone or Subutex "all the time."***  She

also disclosed that GFH compares Subutex patients' prescribed dosage against the levels in their

system to try to determine whether they are illegally selling their pills.  Ms. Costin was

experiencing the worst of her contractions at this point and could not believe what she was hearing or that she was being taunted while in labor.

36.     Approximately one hour later, Nurse Midwife Bennett entered Ms. Costin's hospital room and informed her that the second urine collection tested negative for all substances.  Ms. Costin — somewhat relieved because she expected the new drug test resolved any issues that may have been caused by the initial false positive screen — tried to refocus on labor and continued pleading for an epidural.  ***Nurse Ranttila then informed Ms. Costin that GFH was withholding the epidural, and she would not be receiving it.***  Ms. Costin was confused, humiliated, in pain, and suffering debilitating contractions while trying to process this information.

**GFH Forcefully Induces Labor.**

37.     Shortly thereafter, Nurse Midwife Biss reentered the room and repeated that GFH was withholding the epidural.  As she said this, other GFH nurses connected bags of unidentified fluids to Ms. Costin's IV drip.  Ms. Costin asked again for the epidural.  Nurse Ranttila stated that they were waiting for her to "finish the bag" they had connected to her IV and started squeezing on the bag.  Confused, Ms. Costin asked why she could not have the epidural before she finished receiving fluids.  Nurse Ranttila informed Ms. Costin that she was receiving Pitocin, a drug given intravenously to accelerate her labor.  Ms. Costin began to panic and protested.  She wanted an epidural and did not want to rush into labor.  It was too late.

38.     Ms. Costin's son, Baby A, was born on March 29, 2021 at 10:14 p.m.  During Ms. Costin's eight hours of labor, GFH refused Ms. Costin's pleas for an epidural, ignored her request to withhold the Pitocin absent an epidural and provided her with no pain relief.  As a result, Ms. Costin pushed Baby A out with such force that several inches of Ms. Costin's body were ripped open during delivery.  Due to the violent nature of Baby A's birth, Baby A exited

12

the birth canal with a completely bruised face, and the blood vessels in both of his eyes were burst.  Upon information and belief, his birth was labeled by GFH as a "violent birth" which can cause a newborn serious health issues, including jaundice.

39.     Ms. Costin's untreated pain during her first skin-to-skin contact with Baby A was so severe that she was quivering and barely had the strength to hold him.  The overwhelming pain and trauma of what she had just experienced ruined her expectations of joyously welcoming her newborn son into the world.

40.     From there, things only got worse.  Nurse Ranttila took Baby A away from Ms. Costin, while Nurse Midwife Biss and Nurse Midwife Bennett were actively looking between her legs.  Upon information and belief, they were beginning to repair her torn vaginal area, the severity of which was caused by Baby A's violent exit from Ms. Costin's body. Ms. Costin — weak, exhausted, and shaking from pain — used all the strength she had left to protest, relentlessly yelling across her body for them to stop.  Nurse Midwife Biss and Nurse Midwife Bennett kept Ms. Costin's legs spread open to continue what felt to Ms. Costin like a physical attack, not a medical procedure.  Neither Nurse Midwife Biss nor Nurse Midwife Bennett numbed the area prior to beginning the repairs, so Ms. Costin was in excruciating pain.  As Ms. Costin protested, she could feel a needle entering and exiting her body.  Moreover, she could see that Nurse Midwife Bennett (who, again, was a student at the time) was performing the procedure, despite Ms. Costin's repeated insistence upon entering the Snuggery that no student perform any medical examinations or procedures on her.  Despite Ms. Costin's protests and despite Ms. Costin's obvious suffering, Nurse Midwife Biss and Nurse Midwife Bennett continued the procedure through completion.

**GFH Continues its Abuse Following Baby A's Birth.**

41.     When the procedure was complete, Ms. Costin asked Nurse Ranttila to return Baby A to her arms.  Nurse Ranttila did not immediately comply and instead turned to huddle with another nurse who had entered the room, Nurse Nix, as if they were standing guard between Ms. Costin and her son.  Upon information and belief, Nurse Ranttila and Nurse Nix were collecting Baby A's urine to perform yet another toxicology screen, and they were also collecting his meconium (fecal matter) to run additional toxicology tests at a lab outside of the hospital.  Ms. Costin did not consent to either of those tests.  ***Ms. Costin actively protested against Nurse Ranttila and Nurse Nix putting bags in place to collect her son's urine and fecal matter.  They told her she did not have a choice in the matter.***

42.     Shortly thereafter, Nurse Ranttila and Nurse Nix put Baby A into an incubator because he was suffering from severe jaundice caused by, upon information and belief, his violent birth.  He remained in the incubator for multiple days, during which time Ms. Costin could in large part only touch him through the holes in the box or for feedings and changings, with minimal skin-to-skin contact.  Ms. Costin later learned that GFH had a portable machine that would have allowed her to hold Baby A as he underwent treatment for his jaundice, but GFH staff failed to inform her of that option.  Thus, GFH needlessly prevented Ms. Costin and Baby A from having maximum skin-to-skin contact for several days.

43.     As GFH is undoubtedly aware, skin-to-skin contact provides extraordinary benefits to mothers and their newborn children.  Among other things, skin-to-skin contact helps babies properly latch to their mothers' breasts for feeding, and can be critical to producing breastmilk, which was a major part of Ms. Costin's birthing plan.  Ms. Costin's first son was

born with a cleft palate, so he was never able to properly latch to her nipple, and she looked

forward to breastfeeding Baby A.

44.     As recognized by GFH, breast milk is "the best source of nutrition" for babies.

As stated on its website:

> Providing good nutrition for your newborn is crucial. The best source of
> that nutrition is a mother's breast milk. Breastfeeding is one of the best
> ways to provide nutrition to your baby. Breast milk contains just the right
> amount of fat, sugar, water and protein for human digestion, brain
> development and growth, according to the National Women's Health
> Information Center (NWHIC).  The Joyce Stock Snuggery is proud to
> offer specialized breastfeeding education from two International Board
> Certified Lactation Consultants. We are committed to a vision where all
> children are provided the opportunity for the healthiest beginning possible.
> We provide expert breastfeeding and lactation care and education prior to
> delivery, during the delivery stay and after discharge when special needs
> arise.

45.     The Defendants robbed Ms. Costin and Baby A of this critical benefit during the

first days of Baby A's life.  Ms. Costin was persistent in her attempts to breastfeed Baby A once

they left the hospital, so much so that her nipples cracked and bled.  She fought through the pain

and continued trying for several months.  Yet, Baby A was never able to properly latch, and she

was never able to produce a sufficient amount of milk.  Upon information and belief, this was

caused by the Defendants' preventing Ms. Costin skin-to-skin contact with Baby A.

**GFH Refuses to Allow Ms. Costin to Leave the Hospital.**

46.     On March 30, 2021, at approximately 9 a.m., Ms. Costin asked the attending

nurse, Nurse Hooper, if she could go home to shower.  As she had previously informed the

hospital staff, she lives close to GFH and did not feel comfortable showering at the hospital.  She

also wanted to quickly check in on her mother and her other son.  ***Nurse Hooper told her that***

***she could not leave.***  Ms. Costin spent the full day in her hospital room soiled from labor and

delivery.

47.     That day, one of the nurse practitioners informed Ms. Costin that "everyone was discussing" the details of Ms. Costin's labor and delivery.  It was humiliating.  Ms. Costin also heard chatter coming from the hallway about her labor, delivery, drug test results, and other personal information (including her substance abuse disorder and the treatment she was taking for it) — all of which should have been kept private and confidential by her caretakers and not gossiped about by hospital staff.  Ms. Costin wanted to call her mother for support, but she was too scared to speak about what had transpired while she was still in the hospital, for fear of retribution.

48.     The next morning, on March 31, 2021, Ms. Costin once again asked to go home so she could shower.  The new attending nurse, ***Nurse Smith, told Ms. Costin that she could not leave the hospital*** until speaking with the attending doctor, who would be visiting her room by 4:00 p.m.  Upon information and belief, that was not true — GFH was not waiting for a doctor to permit Ms. Costin to leave her hospital room; GFH was holding her there, against her will, to be interrogated by a social services worker about the false positive drug test.

49.     Unbeknownst to Ms. Costin, Social Worker Deschene, GFH's on-staff social worker, had contacted the New York State Child Abuse and Maltreatment Register to report suspicions that Ms. Costin was "responsible for causing or allowing to be inflicted injury, abuse, or maltreatment" (based on the drug screen that GFH was already aware produced a ***false*** positive and was quickly contradicted by a second test).  The hospital required Ms. Costin to stay in her hospital room against her will until a representative from Warren County Child Protective Services ("CPS") could arrive to interrogate her about the initial false positive drug screen results.

50.     Neither GFH nor Social Worker Deschene had a valid basis for reporting
suspicions that Ms. Costin was "responsible for causing or allowing to be inflicted injury, abuse,
or maltreatment" of Baby A based on the results of their initial false positive drug screening test.
As the hospital is well-aware, their urine screening tests are inherently unreliable.  The lab
reports prepared by the hospital state that positive results are only "PRESUMPTIVE" and that
"[t]he specimen analys[e]s [are] performed without chain of custody handling."  The hospital lab
statements also warn that "[t]he results obtained are to be used for medical purposes only and not
for legal … purposes."

51.     Indeed, it is common knowledge in the medical field that urine screenings are not
reliable to assess drug usage without a confirmatory forensic test.  *See, e.g.*, Moeller et al., *Urine
Drug Screening: Practical Guide for Clinicians*, 83 Mayo Clinic Proceedings 66, 66, 74 (2008)
("A confirmatory test (*e.g.*, GC-MS) is required before decisions can be made on the basis of
UDSs," *i.e.*, urinary drug screens; and "[t]he main disadvantage of immunoassays" which are
"the most common method for the initial screening process" is "obtaining false-positive results
when detection of a drug in the same class requires a second test for confirmation."); Arthur L.
Kellermann et al., *Utilization and Yield of Drug Screening in the Emergency Department*, 6 Am.
J. of Emergency Med. 14, 19 (1987) ("investigators have reported false-negative rates for urine
screening of 30% and higher."); Brahm, et al., *Commonly Prescribed Medications and Potential
False-Positive Urine Drug Screens*, 67 Am. J. Health-Sys Pharm 1344, 1349 (2010) ("A number
of routinely prescribed medications have been associated with triggering false-positive UDS
results.  Verification of the test results with a different screening test or additional analytical tests
should be performed to avoid adverse consequences for the patients."); Moeller et al., *Urine

*Drug Screening: Practical Guide for Clinicians*, 83 Mayo Clinic Proceedings 66, 72-73 (2008) (demonstrating that certain anti-depressants can produce a positive indication for PCP).

52.     Yet, because of Ms. Costin's known disability (substance abuse disorder), GFH not only denied her equal labor and delivery services, but treated the initial false positive drug screen as if it was gospel.  Further, they misleadingly described the urine collection in Ms. Costin's medical records to suggest that the second urine sample (which produced a negative drug screening result) was not collected in an identical manner to the first urine sample.  They wrote that "Ms. Costin was left alone with [Mr. Gonzalez] to give second sample."  In fact, for both the first and second urine sample, Ms. Costin was alone in the bathroom of her hospital room to collect the urine, with the bathroom door cracked open, while a nurse stood outside of the bathroom door, and Mr. Gonzalez remained in the hospital room (not in the bathroom with Ms. Costin).  Upon information and belief, Social Worker Deschene reported the same misleading information to CPS to suggest that the second sample produced the unreliable result.

53.     At approximately 4:00 p.m., Annamarie Ackerman ("Ms. Ackerman"), a case worker from CPS, entered Ms. Costin's hospital room.  Ms. Ackerman directed Ms. Costin to take yet *another* urine screening test (*i.e.*, the *third* urine sample that Ms. Costin provided to the hospital since being admitted less than 36 hours earlier) and directed Ms. Costin to collect the urine in her presence.  Ms. Costin, who felt like she could not leave the room and had no choice, complied.  For unknown reasons, Ms. Ackerman also asked Baby A's father to take a drug test while he was in Ms. Costin's hospital room.

54.     Ms. Ackerman informed Ms. Costin that she would also be speaking to Ms. Costin's other son ("Son C") the following day, as well as with Son C's biological father.  Ms. Costin told Ms. Ackerman that Son C's father has no relation to Baby A and explained that

18

she had a long, protracted battle with Son C's father to obtain full custody of her son, that the arrangement was finally working out well, and that she did not want Ms. Ackerman to poke that proverbial bear.  Ms. Ackerman did not commit to proceeding in any particular way, but she instructed Ms. Costin to sign certain papers and provide broad releases of her and her children's medical records.  Ms. Ackerman then left.

55.     Only after requiring Ms. Costin to stay in her hospital room and endure CPS's impositions did GFH finally allow Ms. Costin to go home to shower, as she had requested hours earlier.  Ms. Costin went home, showered, spoke to her mother and son, and rushed back to the hospital.  When she arrived at the hospital, she asked for a meeting to discuss the hospital's mistreatment of her.

**Ms. Costin and Her Mother Meet with GFH Managers.**

56.     On April 1, 2021, Ms. Costin and her mother attended a meeting with GFH's representatives.  The following hospital staff were in attendance: Defendant Alycia Gregory, Director of Case Management; Mary Shannon, the Director of Nursing; Kristina Lafreniere, the Nursing Manager of the Snuggery; and Jason Hare, the Director of Patient Experience. Ms. Costin had been informed the day prior that GFH's lab director would also be in attendance, but he did not show up to the meeting.  Ms. Costin was not provided with any explanation as to why he did not attend.

57.     The meeting lasted approximately one hour.  During the meeting, Ms. Costin provided details about GFH's discrimination against her, including, but not limited to:  (1) taking drug tests without her informed consent based on — as Nurse Ranttila admitted — the hospital's practice of doing so to patients who are prescribed Subutex and/or Suboxone, (2) using Ms. Costin's disability, under the cover of an unreliable urine screening test *that was promptly revealed to be a false positive*, to withhold pain relief, refuse Ms. Costin's repeated requests for

19

an epidural during her eight hours of labor, disregard her demand that students not perform procedures or examinations on her body, and forcefully induce labor over her objection; and (3) after delivery, continuing to use Ms. Costin's disability, also under the cover of an unreliable urine screening test, to prevent her from having skin-to-skin contact with Baby A (which promotes the production of breastmilk), involve CPS in her birthing experience, and refuse to allow Ms. Costin to leave the hospital under false pretenses.

58.     The hospital's representatives promised to investigate the matters and provide Ms. Costin and her family with answers.  They also assured Ms. Costin and her mother that they would change the manner in which they operate so that no patient is ever treated the way that Ms. Costin was treated.  They further assured Ms. Costin that CPS would not conduct a home visit until further notice, given the circumstances and that Social Worker Gregory would follow the case.  With regard to students performing procedures against Ms. Costin's wishes, GFH's representatives shrugged this off, stating that students "have to start practicing on somebody" — indicating that they valued a student's need for training more than Ms. Costin's express medical directives and needs.

**GFH Prohibits Ms. Costin From Taking Baby A Home from the Hospital.**

59.     At the conclusion of the meeting, Ms. Costin informed GFH's representatives that she felt like her hospital room was a "prison" and that she wanted to be discharged with Baby A immediately.  More than 48 hours had passed since Baby A's birth.  As GFH discloses on its website:

> The average stay for women having a vaginal delivery is 36-48 hours [*i.e.*, 1.5 – 2 days]. ...  You may choose to leave the Hospital earlier if you prefer. You will want to talk with your physician or midwife about an early discharge.  Discharge time is 11:00am. Please plan to have a ride available at that time.  When you are ready to go home, you will be discharged directly from The Joyce Stock Snuggery. A staff member will

accompany you to the main lobby and assist you with placing your baby in your car seat.

60.      GFH refused to honor Ms. Costin's plea to leave with Baby A.  On April 1, 2021, following her meeting with the hospital's representatives, ***Dr. Grassi told Ms. Costin that she was not permitted to leave the hospital with Baby A until CPS had inspected her home and cleared her to bring Baby A home***.  Ms. Costin shared that she did not understand why CPS was still involved in any matters involving her care at the hospital.  ***Dr. Grassi informed her that the hospital reports possible child abuse by every patient that comes in on Suboxone.***

61.      On April 2, 2021, Ms. Gregory told Ms. Costin that CPS had closed its investigation.  She reported that Ms. Costin's initial urine sample (that had been sent to an off-site laboratory for *additional* testing) returned with negative results.  Unbeknownst to Ms. Costin (and contrary to what GFH's nurses told her, but as her now-disclosed medical records reflect), GFH had actually sent her *negative screening* for additional testing — not the false positive test. The Defendants' desperate attempts to secure evidence to maintain their false narrative that Ms. Costin used illicit drugs during her pregnancy had failed.  It was only then — *four days after giving vaginal birth* — that Ms. Costin was "free" to go home with Baby A.

62.      After what seemed like a never-ending nightmare, Ms. Costin was finally permitted to leave the hospital with Baby A and bring him home.  Accompanied by Baby A's father, Ms. Costin and Baby A went home to rest and be at peace.  Unfortunately, Social Worker Gregory's statement that the CPS investigation had been closed simply was not true.  Not even five minutes after Ms. Costin and Baby A entered their home following their hospital discharge, Ms. Ackerman knocked on their front door.  Ms. Ackerman stated that CPS would not close its "investigation" until they received the test results from Baby A's meconium.  She also threatened to call Son C's biological father if Ms. Costin did not sign additional releases and allow her to

21

speak to Son C.  In hopes of putting this nightmare to an end, Ms. Costin allowed Ms. Ackerman to enter her home.  Once inside, Ms. Ackerman interrogated Son C and conducted a home check. That was the last that Ms. Costin heard from CPS, until she received a letter informing her that the report made by GFH of suspected child abuse was unfounded.

63.     As Ms. Costin knew would be the case, all of her own and Baby A's drug tests were confirmed to be negative for illicit substances.

**GFH Falsifies and Alters Ms. Costin's Medical Records.**

64.     On Monday, April 5, 2021, Ms. Costin returned to GFH to obtain her medical records.  She wanted to secure written evidence of what she had experienced at the hospital. GFH refused to provide Ms. Costin with her medical records that day.  Ms. Costin returned to the hospital each day that week to obtain the records but never received a single page.

65.     Determined, Ms. Costin returned on the following Monday, April 12th.  At that time, she was handed a packet of records that were not her own records but those of her son, Baby A.  Included in the packet was an April 8th request that Ms. Costin had made for her medical records, which she was shocked to see had been altered by GFH.  On the form Ms. Costin submitted to obtain her medical records, she properly identified herself as the patient and included her correct date of birth.  On the altered *file copy*, GFH had crossed out her name and her date of birth and replaced it with Baby A's name and date of birth.  Upon information and belief, GFH did this to eliminate any evidence that Ms. Costin had requested her own medical records (which she later learned contained false information and were incomplete).

66.     Ms. Costin returned to the hospital on Wednesday, April 14th and was once again refused access to her medical records.  On Thursday, April 15th, (Ms. Costin's eighth in-person attempt to obtain her medical records), she informed the hospital staff in the records office that she had a right to obtain a copy of her medical records and that she was not leaving the hospital

that day without them.  GFH provided Ms. Costin with a batch of her medical records on this

day, which turned out to be grossly incomplete.  The medical records that GFH provided to

Ms. Costin do not identify the individuals who performed the intrusive and unwanted procedures

on Ms. Costin, do not disclose the medications the hospital administered to Ms. Costin, do not

contain a single toxicology report from the multiple drug tests they purportedly performed, and

do not contain any notes about Baby A's delivery.  They do, however, contain false information.

67.     For example, in direct contrast to what Ms. Costin told Nurse #1, her medical

records falsely state that Ms. Costin:

        a.  habitually smoked cigarettes during her pregnancy;

        b.  habitually smoked marijuana during her pregnancy; and

        c.  had no desire to latch the baby to her breast in order to breastfeed and/or
           did not want to breastfeed her child.

68.     None of those statements were accurate, and they directly contradict what

Ms. Costin informed the hospital upon her intake.

**Negative Birthing Experiences, like that which Ms. Costin and
Baby A Endured, Have Long-Lasting (If Not Lifelong) Consequences.**

69.     In the United States healthcare system, obstetric violence can take many different

forms, but the mistreatment of pregnant persons and abuse of the systems in place to protect

them is so pervasive that, in 2019, the United Nations issued a report addressing obstetric

violence as a widespread, human rights violation.[4]  The report noted that "practices of profound

humiliation" can cause "psychological harm and suffering."[5]  Global research in this field

---

[4]     United Nations Special Rapporteur, *A human rights-based approach to mistreatment and violence against
women in reproductive health services with a focus on childbirth and obstetric violence* (United Nations: 2019),
available from https://eipmh.com/wp-content/uploads/2019/09/UN_Res.71170.pdf.

[5]     *Id.*

confirms that obstetric violence has long-term implications for the health and wellbeing of a

mother and her child:

> [A] negative birth experience may result in lower parental well-being and
> higher (parental) stress symptoms in mothers and partners. The increased
> level of parental stress may, in turn, negatively influence the parent-child
> relationship. Some parents may also suffer from severe symptoms of post-
> traumatic stress disorder after childbirth. Accordingly, a traumatic
> experience may lead to various physiological, emotional, cognitive, and
> behavioral responses, such as heightened arousal, emotional avoidance,
> and distancing from others. Behavior of this kind may result in insecure
> child attachment, meaning that a traumatic birth experience may also have
> a direct negative impact on the parent-child relationship.[6]

70.     Dr. Camilla Pickles, a post-doctoral fellow at the University of Oxford who

examines the intersection of obstetric violence and law, has noted that "women face many

violations during maternity care and it is as if their human rights — dignity, bodily and

psychological integrity, privacy, equality — do not exist."  Rebecca Grant, a journalist who has

covered reproductive rights, health and justice internationally, has observed that subjecting

women "to a cascade of medical interventions unnecessarily and without informed consent is

wrong, harmful to their overall well-being and can be dangerous."[7]

**Ms. Costin and Baby A Have Suffered Immensely.**

71.     The Defendants' actions caused Ms. Costin and Baby A to suffer physical pain

and other medical ailments (including Baby A's severe bruising and jaundice), both while they

were patients at the hospital and thereafter.  While at GFH, Ms. Costin suffered from debilitating

contractions and was provided no relief from any of the medical staff responsible for taking care

of her.  This was caused by GFH's mistreatment of Ms. Costin due to her substance abuse

---

[6]     Annalenna Holopainen, *et al.*, *Childbirth Experience Associated With Maternal and Paternal Stress During
the First Year, but Not Child Attachment*, FRONTIERS IN PSYCHIATRY, Sept. 8,m 2020, at11,
https://doi.org/10.3389/fpsyt.2020.562394.

[7]     Rebecca Grant, *Doctors who ignore consent are traumatizing women during childbirth*, QUARTZ(Dec. 5,
2007), https://qz.com/1146836/doctors-who-ignore-consent-are-traumatizing-women-during-childbirth/.

disorder.  They provided her with no medical reason — and there is none — for withholding the epidural that she repeatedly requested and that her medical records indicate she could have. Ms. Costin's forced birth, against her will, caused additional pain and suffering.  Baby A's birth was so violent that he was born with physical injuries and Ms. Costin's body was ripped open. GFH then robbed both Ms. Costin and Baby A from peaceful, healthy bonding, skin-to-skin contact, and the benefits of breastmilk that they offer their non-disabled patients, *i.e.*, their patients who do not suffer from substance abuse disorder.  Neither Ms. Costin nor Baby A have completely healed from the trauma they suffered at GFH.

72.     Since Baby A's birth, Ms. Costin has struggled to take care of herself and her family.  She spent many months unable to get out of bed.  Ms. Costin was never able to fully breastfeed Baby A and suffered extreme post-partum depression.  She has not been able to sleep and has experienced traumatic nightmares.  She fell behind in her schoolwork.  Since the nightmare at GFH, she has not been able to live a normal, functional life.

73.     Ms. Costin was enrolled in school full-time at Adirondack Community College while pregnant with Baby A.  She was on track to obtain an Associate's Degree in business and marketing when she took what she planned to be a short break from school to give birth.  Her experience at GFH during and after the birth of Baby A derailed her plans.  She fell dramatically behind in her coursework and has not been able to return to school.

74.     Not only were Ms. Costin's goals set back, but her goals as a mother seemed unattainable.  Ms. Costin knew that the first few days after delivery are critical to establish milk supply, and she lost that when she was at GFH after Baby A's birth.  Ms. Costin tried for months but could not produce milk.  She suffered from severe post-partum depression.  She could not take care of herself or her family in the manner that she had hoped.

75.     Even today, Ms. Costin fears the thought of her or her family needing medical care.  She is anxious whenever she, or any one of her family members, has to see a doctor or a nurse.  She knows that it is inevitable that she will have to return to GFH, as it is the only hospital within 15 miles of her home.  In fact, she has already had to return with Baby A's father during an emergency.  There are no other realistic options for emergency medical care. Moreover, Ms. Costin is still very much of the age range where having another baby is a possibility.  She is terrified of going through this ordeal again.  Ms. Costin saw firsthand the damage that medical professionals can cause and has lost the ability to put her trust in them.  It was not just one negligent doctor, one unethical midwife, or one corrupt nurse that hurt Ms. Costin and Baby A.  It was all of them, working together, that discriminated against Ms. Costin. Her disability made her vulnerable in their eyes, and they abused their power.  Because of Ms. Costin's substance abuse disorder, GFH, through its policies and employees, elected not to provide Ms. Costin with equal treatment or access to its services.

## FIRST CAUSE OF ACTION
### (Violation of the Americans with Disabilities Act against GFH)

76.     Ms. Costin restates the allegations set forth above as though fully set forth herein at length.

77.     Ms. Costin suffers from substance abuse disorder, a disability under the American with Disabilities Act.  When untreated, Ms. Costin's addiction to opioids substantially impairs her major life activities.  When untreated, she is unable to care for herself and her physical and mental functioning are substantially limited.  Ms. Costin's opioid addiction has led to multiple arrests and incarcerations and abusive relationships.  When off of her medication, she has had hallucinations, suffered from paranoia, and experienced severe anxiety and panic attacks. Because of her debilitating substance abuse disorder, Ms. Costin has participated in extensive

rehabilitation and has received treatment for more than 10 years.  Under the supervision of her

primary care physician, Ms. Costin has been receiving treatment for her substance abuse disorder

for close to a decade and is no longer using illicit opioids.

78.     Prior to giving birth to Baby A, Ms. Costin was a patient at GFH on at least three

separate occasions, including for surgical procedures and an emergency room admission.  Since

giving birth to Baby A, Mr. Gonzalez (Baby A's father) suffered a medical emergency, and

Ms. Costin rushed him to GFH, the only hospital she could get to in their emergency situation.

In fact, GFH is the only hospital in her neighborhood; her current residence is less than two miles

away from the hospital.  Ms. Costin knows that it is inevitable that she and Baby A will return

there one day.

79.     The ADA provides her with the right to receive equal services and treatment at

GFH.  GFH violated that right when it discriminated against Ms. Costin, through its policies and

employees, because of her disability.

80.     GFH, through its policies and employees, engaged in, among others, the

following discriminatory acts because of Ms. Costin's substance abuse disorder:  (1) conducted

improper and unlawful drug tests of Ms. Costin and Baby A without obtaining Ms. Costin's

informed consent; (2) reported Ms. Costin to state authorities alleging suspected child abuse,

under the cover of a knowingly false positive drug screening test; (3) withheld pain relief and an

epidural from Ms. Costin; (4) forcefully induced labor without Ms. Costin's informed consent;

(5) refused to let Ms. Costin and Baby A leave the hospital under false pretenses; (6) refused to

explain alternatives to Baby A's treatment or why he had to remain in the hospital; and (7) failed

to take steps to avoid the foregoing occurrences.  Upon information and belief, there was no

medical basis for these actions.

81.     Ms. Costin was denied equal treatment and access to services at GFH, a place of public accommodation under the ADA, in violation of her rights.

## SECOND CAUSE OF ACTION
### (Violation of the Rehabilitation Act against GFH)

82.     Ms. Costin restates the allegations set forth above as though fully set forth herein at length.

83.     29 U.S.C. § 794(a) provides, "No otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…."

84.     29 U.S.C. § 794(b) defines "program or activity" as "all operations of…(3)(A) an entire corporation, partnership, or other private organization, or an entire sole proprietorship . . . (ii) which is principally engaged in the business of providing health care . . . ."

85.     Upon information and belief, GFH receives federal financial assistance through federal grants and through Medicaid and Medicare reimbursement.

86.     As set forth above, Ms. Costin suffers from substance abuse disorder, a disability under the Rehabilitation Act.   The Rehabilitation Act provides her with the right to receive equal services and treatment at GFH.  GFH violated that right when it discriminated against Ms. Costin, through its policies and employees, because of her disability.

## THIRD CAUSE OF ACTION
### (Medical Malpractice
### Against GFH, Dr. Grassi, Nurse Ralph, Nurse Ranttila, and Nurse Nix)

87.     Ms. Costin restates the allegations set forth above as though fully set forth herein at length.

88.     The treatment, services, and procedures performed for and upon Ms. Costin by GFH, Dr. Grassi, Nurse Ralph, Nurse Ranttila, and Nurse Nix deviated from the accepted community standards of practice in the medical profession.

89.     Among other things:  (1) Nurse Ralph and Nurse Ranttila conducted improper and unlawful drug tests of Ms. Costin and Baby A without obtaining Ms. Costin's informed consent; (2) Nurse Ranttila withheld pain relief and an epidural from Ms. Costin; (3) Nurse Ranttila forcefully induced labor without Ms. Costin's informed consent; (4) Dr. Grassi prolonged Baby A's stay in the hospital, despite Ms. Costin's pleas to take him home; (5) Nurse Nix failed to obtain Ms. Costin's informed consent on treatment and services provided to Baby A; (6) Dr. Grassi, Nurse Ralph, Nurse Ranttila, and Nurse Nix improperly substituted their judgment for that of Ms. Costin; and (7) they all failed to take steps to avoid the foreseeable occurrences. These actions and inactions ultimately led to, *inter alia*, a violent delivery of Baby A, physical harm to Baby A (including bruising and jaundice, and deprived him of the benefits of his mother's breastmilk), physical harm to Ms. Costin (a torn vaginal area), Ms. Costin's inability to breastfeed Baby A, and severe trauma.

90.     The actions and inactions of Dr. Grassi, Nurse Ralph, Nurse Ranttila, and Nurse Nix departed from the accepted community standards of practice, and such departure was the proximate cause of Ms. Costin's and Baby A's injuries.

91.     GFH is vicariously liable for the acts of Dr. Grassi, Nurse Ralph, Nurse Ranttila, and Nurse Nix, as they were acting within the scope of their employment with GFH when undertaking the foregoing actions and inactions.

92.     Ms. Costin and Baby A suffered damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

**(Ordinary Negligence Against GFH, Social Worker Deschene, and Social Worker Gregory)**

93.    Ms. Costin restates the allegations set forth above as though fully set forth herein at length.

94.    Defendants GFH, Social Worker Deschene, and Social Worker Gregory reported Ms. Costin to state authorities alleging suspected child abuse based on a knowingly false positive and inherently unreliable drug screening test.  Upon information and belief, it is GFH's policy to perform urinary drug screens (which they know are unreliable) on all patients who enter the hospital taking Subutex or Suboxone and to report suspicions of child abuse to state authorities if the results of these knowingly unreliable drug screens produce "positive" results — results which do not conclusively mean, as indicated on GFH's lab documentation, that the individual who provided the urine used illicit drugs.

95.    Rather, as GFH's lab documentation unambiguously provides, such tests should be confirmed by subsequent tests, are ***not*** subject to chain of custody handling, and are intended to be used ***only*** for medical purposes.  GFH, Social Worker Deschene, and Social Worker Gregory ignored those warnings and used the results to label Ms. Costin as a drug abuser, report her to child protective services as a suspected child abuser, and put her entire family at risk of an investigation and separation.

96.    GFH, Social Worker Deschene, and Social Worker Gregory owed Ms. Costin a duty of care, and the services performed by each deviated from the standard of care of reasonably prudent social workers.  They had no reasonable basis to rely on an inherently unreliable drug screening analysis that was quickly proven to be a false positive.  They had no reasonable basis to contact child protective services based on GFH's erroneous drug test screening.  Nor did they have any reasonable basis to mislead child protective services by

suggesting that the second urine sample was not collected in an identical manner to the first urine

sample (*i.e.*, by Ms. Costin alone in the bathroom of her hospital room, with the door cracked

open, the nurse standing outside of the bathroom door, and Mr. Gonzalez in the hospital room).

97.     GFH is vicariously liable for Social Worker Deschene and Social Worker

Gregory's actions.  They were acting on GFH's behalf when they engaged in the actions

described above, and they were acting within the scope of their employment.

98.     Further, upon information and belief, Ms. Costin's initial urine sample was

mishandled by GFH, resulting in a false positive being attributed to her.  There simply is no

other explanation for the false positive result, given the negative screening that followed shortly

thereafter.  Upon information and belief, GFH is negligent in its administration of urine drug

screens and use of the results.

99.     GFH, Social Worker Deschene, and Social Worker Gregory displayed a high

degree of moral culpability, and their actions were willful, wanton, reckless, and malicious.

100.     As a direct result of the GFH, Social Worker Deschene, and Social Worker

Gregory's actions, Ms. Costin and Baby A suffered harm.  Their deviation from the standard of

care of a hospital and social workers was the proximate cause of harm to Ms. Costin and Baby A.

101.     Ms. Costin and Baby A suffered damages in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION

**(Lack of Informed Consent Pursuant to NY Pub. Health Law § 2805(d)
Against GFH, Dr. Grassi, Nurse Ralph, and Nurse Ranttila)**

102.     Ms. Costin restates the allegations set forth above as though fully set forth herein

at length.

103.     As a patient at GFH, Ms. Costin was entitled to know what medical care GFH and

its employees were performing on her and Baby A, and the risks, complications, and alternatives

of such medical care.  GFH had a duty to provide her with this information and obtain her consent before performing any tests or procedures.

104.     GFH and Nurse Ralph failed to obtain Ms. Costin's informed consent to performing the initial drug screening test on her urine.  A reasonably prudent person in Ms. Costin's position would not have agreed to this testing if fully informed, given the known unreliability of the urine screening tests and the possibility that false positive results are reported to child protective services agencies and used to open investigations of child abuse and neglect. Ms. Costin and Baby A suffered harm by GFH's and Nurse Ralph's failure to obtain her informed consent because the tests resulted in a false positive and GFH and its employees used the false positive results to label Ms. Costin a drug abuser; provide her with substandard medical treatment and services (far worse than what they provide their other patients), resulting in a violent birth, vaginal tearing, bruising and jaundice; report suspected child abuse and neglect to government officials; interfere with Ms. Costin's ability to have skin-to-skin contact with Baby A and provide him with breastmilk; keep Ms. Costin in the hospital against her will and delay Ms. Costin's ability to take Baby A home, away from the terrors of their GFH experience. GFH's and Nurse Ralph's failure to obtain Ms. Costin's informed consent was the proximate cause of this harm.

105.     GFH and Nurse Ranttila failed to obtain Ms. Costin's informed consent to force labor without an epidural.  A reasonably prudent person in Ms. Costin's position would not have agreed to this procedure if fully informed, as demonstrated by her constant pleas for an epidural and her objections to the Pitocin injection without the epidural.  Ms. Costin and Baby A suffered harm by GFH's and Nurse Ranttila's provision of Pitocin and withholding of an epidural as evidenced by the physical and mental pain, suffering, and trauma they suffered.  GFH's and

Nurse Ranttila's failure to obtain Ms. Costin's informed consent was the proximate cause of this harm.

106.    GFH and Dr. Grassi failed to obtain Ms. Costin's informed consent to keep Baby A in the hospital, despite Ms. Costin's pleas to leave with Baby A.  A reasonably prudent person in Ms. Costin's position would not have agreed to keeping Baby A in the hospital after their horrific and traumatic ordeal, as demonstrated by her constant pleas to leave.  Ms. Costin and Baby A suffered physical and psychological harm by keeping Baby A in the hospital against Ms. Costin's wishes.  GFH's and Dr. Grassi's failure to obtain Ms. Costin's informed consent was the proximate cause of this harm.

107.    Dr. Grassi, Nurse Ralph and Nurse Ranttila were acting within the scope of their employment when undertaking the foregoing actions, which were the direct and proximate cause of Ms. Costin and Baby's harm.  As a result, GFH is vicariously liable.

108.    Ms. Costin and Baby A suffered damages in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

**(False Imprisonment Against GFH, Nurse Hooper, and Nurse Smith)**

109.    Ms. Costin restates the allegations set forth above as though fully set forth herein at length.

110.    On March 30, 2021, the day after giving birth to Baby A, Ms. Costin asked to leave the hospital.  Nurse Hooper told her that she could not leave, intending to confine her. GFH, through the actions of Nurse Hooper, intended to Ms. Costin to her hospital room against her will.

111.    On March 31, 2021, Ms. Costin asked Nurse Smith to leave the hospital.  Nurse Smith told Ms. Costin that she could not leave until she saw a physician later that day when, in

fact, GFH and Nurse Smith were confining Ms. Costin in her hospital room against her will until CPS arrived to interrogate her.

112.    There were no legitimate or medical reason to keep Ms. Costin in the hospital, and none of GFH, Nurse Hooper, or Nurse Smith had any authority to restrict her from leaving. On both occasions, Ms. Costin informed Nurse Hooper and Nurse Smith, respectively, that she wanted to leave the hospital and go home, and even told certain GFH representatives that she felt like she was in "prison," indicative of her consciousness of her confinement.  She did not consent to staying at the hospital.  Ms. Costin reasonably believed that she could not leave the hospital as a result of words and actions undertaken by Nurse Hooper and Nurse Smith.

113.    Ms. Costin suffered harm and trauma as a result of this false imprisonment.

114.    Ms. Costin suffered damages in an amount to be determined at trial.

### SEVENTH CAUSE OF ACTION
### (Violation of New York State Human Rights Law Against GFH)

115.    Ms. Costin restates the allegations set forth above as though fully set forth herein at length.

116.    Pursuant to Executive Law Article 15 §§ 291 and 296(2)(a), it is unlawful discriminatory practice to deny a person equal opportunity of use of the advantages, facilities or privileges thereof, of a public accommodation on the basis of sex or a disability.

117.    Under New York Law, distinctions based on a person's pregnant condition constitutes unlawful sexual discrimination.  As a matter of pattern and practice, GFH treats pregnant persons as a class of patients that are treated differently than other patients, constituting *prima facie* sexual discrimination.  GFH conducts drug tests on pregnant women without their informed consent.  GFH conducted such tests on Ms. Costin and her newborn son without

consent.  Upon information and belief, this continued practice constitutes a continuing discriminatory policy at a place of public accommodation.

118.    Under New York Law, distinctions based on a person's substance abuse disorder constitutes unlawful discrimination based on a disability.  As a matter of pattern and practice, GFH treats persons with substance abuse disorder as a class of patients that are treated differently than other patients, constituting *prima facie* discrimination based on a disability. GFH conducts drug tests on patients with substance abuse disorder without their informed consent.  GFH conducted such tests on Ms. Costin and her newborn son without consent.  Upon information and belief, this continued practice constitutes a continuing discriminatory policy at a place of public accommodation.

119.    Ms. Costin has suffered harm as a result.

120.    Ms. Costin suffered damages in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION
### (Assault and Battery Against Nurse Midwife Biss and Nurse Midwife Bennett)

121.    Ms. Costin restates the allegations set forth above as though fully set forth herein at length.

122.    GFH, Nurse Midwife Biss, and Nurse Midwife Bennett assaulted and battered Ms. Costin when they inserted a needle through her perineal area without her consent, and continued to do so over her express objection.

123.    Ms. Costin has suffered harm as a result.  She was forced to undergo and recover from a painful procedure without any pain relief or numbing medication despite her objections.

124.    Ms. Costin suffered damages in an amount to be determined at trial.

## NINTH CAUSE OF ACTION

**(Intentional Infliction of Emotional Distress Against
GFH, Dr. Grassi, Nurse Ralph, Nurse Ranttila, Nurse Nix, Nurse Hooper,
Nurse Smith, Social Worker Deschene, and Social Worker Gregory)**

125.    Ms. Costin restates the allegations set forth above as though fully set forth herein at length.

126.    GFH, Dr. Grassi, Nurse Ralph, Nurse Ranttila, Nurse Nix, Nurse Hooper, Nurse Smith, Social Worker Deschene, and Social Worker Gregory engaged in conduct that was extreme and outrageous, including the following acts:  (1) conducted improper and unlawful drug tests of Ms. Costin and Baby A without obtaining Ms. Costin's informed consent; (2) reported Ms. Costin to state authorities alleging suspected child abuse, under the cover of a knowingly false positive drug screening test; (3) withheld pain relief and an epidural from Ms. Costin; (4) forcefully induced labor without Ms. Costin's informed consent; (5) refused to let Ms. Costin and Baby A leave the hospital under false pretenses; (6) refused to explain alternatives to Baby A's treatment or why he had to remain in the hospital; and (7) failed to take steps to avoid the foregoing occurrences.  There was no medical basis for these actions.

127.    Dr. Grassi, Nurse Ralph, Nurse Ranttila, Nurse Nix, Nurse Hooper, Nurse Smith, Social Worker Deschene, and Social Worker Gregory undertook these actions with total disregard for the very high risk of causing debilitating emotional distress to Ms. Costin. Ms. Costin made each actor aware of how their conduct was affecting her and Baby A, and they continued despite her complaints of humiliation, pain, and trauma.

128.    Dr. Grassi, Nurse Ralph, Nurse Ranttila, Nurse Nix, Nurse Hooper, Nurse Smith, Social Worker Deschene, and Social Worker Gregory were acting within the scope of their employment when undertaking these actions, and Ms. Costin suffered severe emotional distress

as a direct result of their actions.  As a result, GFH is vicariously liable for the actions of its employees.

129.   Ms. Costin suffered damages in an amount to be determined at trial.

## TENTH CAUSE OF ACTION

**(Negligent Infliction of Emotional Distress Against
GFH, Dr. Grassi, Nurse Ralph, Nurse Ranttila, Nurse Nix, Nurse Hooper,
Nurse Smith, Social Worker Deschene, and Social Worker Gregory)**

130.   Ms. Costin restates the allegations set forth above as though fully set forth herein at length.

131.   GFH, Dr. Grassi, Nurse Ralph, Nurse Ranttila, Nurse Nix, Nurse Hooper, Nurse Smith, Social Worker Deschene, and Social Worker Gregory owed Ms. Costin a duty of care.

132.   GFH, Dr. Grassi, Nurse Ralph, Nurse Ranttila, Nurse Nix, Nurse Hooper, Nurse Smith, Social Worker Deschene, and Social Worker Gregory engaged in conduct that was extreme and outrageous, including:  (1) conducted improper and unlawful drug tests of Ms. Costin and Baby A without obtaining Ms. Costin's informed consent; (2) reported Ms. Costin to state authorities alleging suspected child abuse, under the cover of a knowingly false positive drug screening test; (3) withheld pain relief and an epidural from Ms. Costin; (4) forcefully induced labor without Ms. Costin's informed consent; (5) refused to let Ms. Costin and Baby A leave the hospital under false pretenses; (6) refused to explain alternatives to Baby A's treatment or why he had to remain in the hospital; and (7) failed to take steps to avoid the foregoing occurrences.  There was no medical basis for these actions.

133.   Dr. Grassi, Nurse Ralph, Nurse Ranttila, Nurse Nix, Nurse Hooper, Nurse Smith, Social Worker Deschene, and Social Worker Gregory were acting within the scope of their employment when undertaking these actions, and Ms. Costin suffered severe emotional distress

as a direct result of their actions.  As a result, GFH is vicariously liable for the actions of its employees.

134.    Ms. Costin and Baby A suffered damages in an amount to be determined at trial.

## ELEVENTH CAUSE OF ACTION

### (Violation of the New York General Business Law Against GFH)

135.    Ms. Costin restates the allegations set forth above as though fully set forth herein at length.

136.    Sections 349 and 350 of the New York General Business Law prohibits deceptive acts and false advertising "in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]."

137.    GFH's website and Patient Bill of Rights (which is posted all around the hospital) is full of deception and false advertisements.  By way of example, on its website, GFH advertises that:

    a.    It is the "Best Childbirth Center in the Adirondacks."

    b.    Its "patients are everything."

    c.    Its maternity ward, the Joyce Stock Snuggery (the "Snuggery"), "was the setting for more than 41,000 births" and that "[e]ach" of those births "received the same outstanding, personalized care the Snuggery has become synonymous with."

    d.    Its "primary concern … is the comfort and safety of our patients and visitors" and that it "strive[s] to make your visit as comfortable and convenient as possible."

138.    GFH's Patient Bill of Rights promises GFH's patients that they have the right to, among other things:

    a.    "Receive treatment without discrimination as to … disability";

    b.    "Receive considerate and respectful care";

      c.      "Know the names, positions and functions of any hospital staff involved in your care and refuse their treatment, examination or observation";

      d.      "Receive all the information you need to give informed consent for any proposed procedure or treatment";

      e.      "Refuse treatment";

      f.      "Privacy while in the hospital and confidentiality of all information and records regarding your care"; and

      g.      "Participate in all decisions about your treatment and discharge from the hospital."

139.     These representations were deceptive, false and materially misleading.  Upon information and belief, GFH does not treat all patients equally and those representations do not apply to patients who GFH does not hold in high regard.

140.     GFH has willfully or knowingly violated this statute by making such representations.

141.     Ms. Costin suffered harm as a result of GFH's deception and false advertising.

142.     Ms. Costin suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request a judgment as follows:

      (a)     Compensatory damages in an amount to be determined at trial;

      (b)     Punitive damages in an amount to be awarded at trial;

      (c)     Statutory damages, including treble damages under GBL §349;

      (d)     Injunctive relief halting GFH's discriminatory and deceptive practices;

      (e)     Attorney's fees and costs; and

      (f)     Any and all other relief to which the Court determines Ms. Costin and Baby A are entitled.

Dated: New York, New York
June 23, 2022

SCHULTE ROTH & ZABEL LLP

/s/ Taleah E. Jennings
Taleah E. Jennings
Frances D. Rodriguez
John Mixon

919 Third Avenue
New York, NY  10022
Telephone: 212.756.2000
taleah.jennings@srz.com

*Attorneys for Plaintiffs*