UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

NICOLE COSTIN, *individually and on behalf of her minor son, BABY A*,

                                **Plaintiff,**

    vs.

GLENS FALLS HOSPITAL, KEVIN M. GRASSI M.D., STACEY L. RALPH, KAREN RANTTILA, LYNETTE M. BISS, NICOLE BENNETT, JENNIFER NIX, AMY HOOPER, JODIE SMITH, STEPHANIE DECHENE, and ALYCIA N. GREGORY,

                                **Defendants.**

1:22-CV-00296
(MAD/CFH)

---

**APPEARANCES:**

**SCHULTE ROTH & ZABEL LLP**
919 Third Avenue
New York, New York 10022
Attorneys for Plaintiff

**MCPHILLIPS, FITZGERALD LAW FIRM**
288 Glen Street, P.O. Box 299
Glens Falls, New York 12801
Attorneys for Defendants Glens Falls Hospital, Kevin M. Grassi M.D., Stacey L. Ralph, Jennifer Nix, Amy Hooper, Jodie Smith, Stephanie Dechene, and Alycia N. Gregory

**REBAR KELLY**
470 Norristown Road, Suite 201
Blue Bell, Pennsylvania 19422
Attorneys for Defendant Karen Ranttila

**OFFICE OF UNITED STATES ATTORNEY**
James T. Foley U.S. Courthouse
445 Broadway, Room 218
Albany, New York 12207

**OF COUNSEL:**

FRANCES RODRIGUEZ, ESQ.
TALEAH E. JENNINGS, ESQ.
WILLIAM H. GUSSMAN, ESQ.
JOHN PAUL MIXON, ESQ.

ERIC C. SCHWENKER, ESQ.

CATHLEEN KELLY REBAR, ESQ.

C. HARRIS DAGUE, ESQ.

Attorneys for Defendant Lynette M. Biss

**MARTIN CLEARWATER & BELL LLP**
245 Main Street, Suite 501
White Plains, New York 10601
Attorneys for Defendant Nicole Bennett

**CHRISTOPHER JOSEPH DANIEL, ESQ.**

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

On March 28, 2022, Plaintiff Nicole Costin, individually and on behalf of her minor son, Baby A, commenced this action against Defendants Glens Falls Hospital ("GFH"); Kevin M. Grassi M.D. ("Dr. Grassi"); Stacey L. Ralph ("Nurse Ralph"); Karen Ranttila ("Nurse Ranttila"); Lynette M. Biss ("Midwife Biss"); Nicole Bennett ("Midwife Bennett"); Jennifer Nix ("Nurse Nix"); Amy Hooper ("Nurse Hooper"); Jodie Smith ("Nurse Smith"); Stephanie Dechene ("Social Worker Deschene"); and Alycia N. Gregory ("Social Worker Gregory"). *See* Dkt. No. 1. The amended complaint asserts eleven causes of action: (1) violations of the Americans with Disabilities Act ("ADA") against GFH; (2) violations of the Rehabilitation Act against GFH; (3) medical malpractice against GFH, Dr. Grassi, Nurse Ralph, Nurse Ranttila, and Nurse Nix; (4) negligence against GFH, Social Worker Deschene, and Social Worker Gregory; (5) violations of New York Public Health Law § 2805-d against GFH, Dr. Grassi, Nurse Ralph, and Nurse Ranttila; (6) false imprisonment against GFH, Nurse Hooper, and Nurse Smith; (7) violations of New York Human Rights Law against GFH; (8) assault and battery against Midwife Biss and Midwife Bennett; (9) intentional infliction of emotional distress against GFH, Dr. Grassi, Nurse Ralph, Nurse Ranttila, Nurse Nix, Nurse Hooper, Nurse Smith, Social Worker Deschene, and Social Worker Gregory; (10) negligent infliction of emotional distress against GFH, Dr. Grassi,

2

Nurse Ralph, Nurse Ranttila, Nurse Nix, Nurse Hooper, Nurse Smith, Social Worker Deschene, and Social Worker Gregory; and (11) violations of New York General Business Law §§ 349 and 350 against GBH. *See* Dkt. No. 14 at ¶¶ 76-142.

Currently before the Court are four separate motions: (1) a motion to dismiss the complaint by GFH, Dr. Grassi, Nurse Ralph, Nurse Nix, Nurse Smith, Nurse Hooper, Social Worker Deschene, and Social Worker Gregory (collectively, the "GFH Defendants"), *see* Dkt. No. 26; (2) a motion to dismiss by Midwife Bennett, *see* Dkt. No. 47; (3) a motion to dismiss by Nurse Ranttila, *see* Dkt. No. 50; and (4) a motion to substitute the United States as a defendant in the place and stead of Midwife Biss and to dismiss, *see* Dkt. No. 61. Plaintiff opposes each motion. *See* Dkt. Nos. 35, 51, 55, 62. For the reasons set forth below, the motions to dismiss by the GFH Defendants, Midwife Bennett, and Nurse Ranttila are granted, and the motion to substitute and dismiss by the United States is denied as moot.

## II. BACKGROUND

According to the amended complaint, Plaintiff was 38.5 weeks pregnant with Baby A when, on March 29, 2021, her water broke. *See* Dkt. No. 14 at ¶ 24. Plaintiff contacted nonparty Hudson Headwaters Health Network Women's Health ("HHHN"), who instructed her to go to GFH's maternity ward, known as the Joyce Stock Snuggery. *See id.* When Plaintiff checked into her hospital room, she was met by Nurse Ralph and a nonparty student nurse. *See id.* at ¶ 26. Plaintiff told Nurse Ralph that although the student nurse was welcome to observe, Plaintiff did not consent to any student practitioners performing any medical examinations or procedures on her or Baby A. *See id.* During their subsequent conversation, Plaintiff told Nurse Ralph that she wanted an epidural to be administered during labor and stressed to her that this was the most important component of her birthing plan. *See id.*

3

Nurse Ralph then asked Plaintiff what medications she was taking. *See id.* at ¶ 28. Plaintiff responded that she was taking Subutex twice a day, as prescribed by her primary care physician. *See id.* Subutex, a form of Suboxone, is a treatment medication for individuals with substance abuse disorder. *See id.* The amended complaint asserts that, when untreated and off her medication, Plaintiff "is unable to care for herself, ... her physical and mental functioning are substantially limited," and she suffers from "hallucinations, ... paranoia, and ... severe anxiety and panic attacks." *Id.* at ¶ 29. However, Plaintiff has "participated in extensive rehabilitation and has received treatment for more than 10 years under the close supervision of her primary care physician." *Id.* Thus, although Plaintiff "still has substance abuse disorder and still requires treatment, [she] is no longer using illicit opioids." *Id.*

At around 7:00 p.m., the maternity ward unit had a shift change, and Nurse Ralph met with the incoming nurse, Nurse Ranttila. *See id.* at ¶ 31. During that meeting, Nurse Ralph informed Nurse Ranttila that Plaintiff was taking Subutex. *See id.* Plaintiff also overheard Nurse Ralph tell Nurse Ranttila that GFH was awaiting the results of a urine toxicology screen. *See id.* at ¶ 32. Plaintiff had not been informed about, or consented to, any such test. *See id.* Plaintiff did not say anything at the time because "she knew that she was not an illicit drug user" and she was distracted by painful contractions. *Id.* at ¶ 33. As the evening progressed, these contractions became so intense that Plaintiff "went in and out of consciousness and temporarily lost her sight and hearing." *Id.* Plaintiff asked Nurse Ranttila to prepare her epidural shot and Nurse Ranttila told her that GFH's anesthesiologist was on call but that she would contact him to get the epidural process started. *See id.*

Midwife Biss and Midwife Bennett periodically entered Plaintiff's hospital room to check her dilation during this period. *See id.* Midwife Biss was an employee of HHHN and was

4

providing services to Plaintiff at GFH. *See id.* at ¶ 12. Midwife Bennett was, at the time period relevant to this proceeding, a student midwife accompanying Midwife Biss. *See id.* at ¶ 13. At some point while Plaintiff was waiting for an epidural for her contractions, Midwife Bennett entered Plaintiff's hospital room and "blurted" out, "Your urine test came back with positive results for both cocaine and PCP." *See id.* at ¶ 34. In response, Plaintiff "immediately informed everyone in the room that the positive results were wrong, she did not take cocaine or PCP during her pregnancy, and the hospital must have made an error in the lab or tested the wrong patient's urine." *Id.* Plaintiff asked Nurse Ranttila to immediately redo the urine test, or test her blood. *See id.* Plaintiff also continued to "beg" for an epidural. *See id.* at ¶ 35.

Nurse Ranttila then collected additional urine to conduct a second drug screening test. *See id.* While doing so, Nurse Ranttila asked Plaintiff, "Are you sure you didn't do cocaine before coming in?" *Id.* Nurse Ranttila also disclosed to Plaintiff that (1) "GFH drug tests pregnant women who take Suboxone or Subutex 'all the time'"; and (2) "GFH compares Subutex patients' prescribed dosage against the levels in their system to try to determine whether they are illegally selling their pills." *Id.* Approximately one hour later, Midwife Bennett informed Plaintiff that the second urine collection tested negative for all substances. *See id.* at ¶ 36.

Meanwhile, other GFH nurses had connected bags of unidentified fluids to Plaintiff's IV drip. *See id.* at ¶ 37. When Plaintiff reiterated her request for an epidural, Nurse Ranttila informed her that GFH was withholding the epidural and, instead, "they were waiting for her to 'finish the bag' they had connected to her IV ... ." *Id.* When Plaintiff asked why she could not have the epidural before she finished receiving fluids, Nurse Ranttila clarified that the bags contained Pitocin, a drug given intravenously to accelerate labor. *See id.* Thereafter, despite Plaintiff's continued protests, GFH staff refused to administer any pain relief, ignored her request

5

to withhold the Pitocin, and proceeded with inducing labor. *See id.* at ¶ 38.

Baby A was born on March 29, 2021 at 10:14 p.m., and came out "with such force that several inches of [Plaintiff's] body were ripped open during delivery." *Id.* Nurse Ranttila took Baby A while Midwife Biss and Midwife Bennett examined Plaintiff's torn vaginal area. *Id.* at ¶ 40. Despite Plaintiff's "relentless[ ] yelling ... for them to stop," Midwife Biss and Midwife Bennett proceeded to sew Plaintiff's vaginal wound closed with a needle, without any form of pain relief. *Id.* Meanwhile, as a result of the "violent nature" of Baby A's birth, Baby A suffered a "completely" bruised face and burst blood vessels in both eyes. *Id.* at ¶ 38. Over Plaintiff's protests, Nurse Ranttila and Nurse Nix proceeded to collect Baby A's urine and meconium to run additional toxicology tests. *See id.* at ¶ 41. Nurse Ranttila and Nurse Nix informed Plaintiff that she did not have a choice in the matter, and placed Baby A in an incubator to treat his "severe jaundice." *Id.* at ¶¶ 41-42. The amended complaint claims that even though GFH had a portable machine available that would have allowed Plaintiff to hold Baby A, GFH staff kept Baby A in a type of incubator that allowed only minimal skin-to-skin contact for "multiple days." *See id.* at ¶ 42.

The next day, Plaintiff attempted to leave GFH to shower, but was told she was not allowed to leave. *See id.* at ¶ 46. As the day progressed, a nonparty nurse informed Plaintiff "that 'everyone was discussing' the details of her labor and delivery." *Id.* at ¶ 47. In fact, Plaintiff herself "heard chatter coming from the hallway about her labor, delivery, drug test results, and other personal information (including her substance abuse disorder and the treatment she was taking for it)." *Id.* Plaintiff attempted to leave again the following day, but Nurse Smith told Plaintiff that she could not leave until she spoke to the attending doctor, who would be visiting her room by 4:00 p.m. *See id.* at ¶ 48.

6

Meanwhile, Social Worker Deschene—GFH's on-staff social worker—had contacted Warren County Child Protective Services ("CPS") at some point after the initial drug test came back positive "to report suspicions that [Plaintiff] was 'responsible for causing or allowing to be inflicted injury, abuse, or maltreatment'" on Baby A. *Id.* at ¶ 49. The amended complaint asserts that Nurse Smith's claim that Plaintiff had to wait to speak to the attending doctor was a lie; instead, GFH was keeping Plaintiff in the hospital until she could be "interrogated" by CPS. *Id.* at ¶¶ 48-49. The amended complaint further asserts that GFH staff "misleadingly described the urine collection in [Plaintiff's] medical records to suggest that the second urine sample (which produced a negative drug screening result) was not collected in an identical manner to the first urine sample" in order to "suggest that the second sample produced the unreliable result." *Id.* at ¶ 52.

Ultimately, a CPS caseworker arrived at approximately 4:00 p.m. and directed Plaintiff to submit to a third urine screening test. *See id.* at ¶ 53. The caseworker also directed Baby A's father, who was in the room at the time, to take a drug test. *See id.* After the caseworker left, Plaintiff was allowed to go home to shower. *See id.* Upon her return, Plaintiff met with GFH representatives who "assured [Plaintiff] ... that they would change the manner in which they operate so that no patient is ever treated the way that [Plaintiff] was treated" and told her that "CPS would not conduct a home visit until further notice, given the circumstances," and that Social Worker Gregory, a social worker employed by GFH, "would follow the case." *Id.* at ¶ 58. However, with respect to students performing procedures against Plaintiff's wishes, GFH's representatives stated only that students "'have to start practicing on somebody.'" *Id.*

After the meeting, Plaintiff requested to leave with Baby A. *See id.* at ¶ 59. Dr. Grassi told Plaintiff that she was not permitted to leave the hospital with Baby A until CPS had inspected

7

her home and cleared her to bring Baby A home. *See id.* at ¶ 60. Dr. Grassi also stated that GFH "reports possible child abuse by every patient that comes in on Suboxone." *Id.* On April 2, 2021, Social Worker Gregory informed Plaintiff that CPS had closed it investigation, and reported that her first positive urine sample had been sent to an off-site laboratory for additional testing and returned with negative results. *See id.* at ¶ 61. Plaintiff was then allowed to go home with Baby A. *See id.*

However, not "even five minutes" after Plaintiff arrived at home, the CPS caseworker arrived and informed Plaintiff that the CPS investigation would not be closed until they received the test results from Baby A's meconium. *See id.* at ¶ 62. Over the next several weeks, Plaintiff made a number of attempts to obtain her medical records from GFH. *See id.* at ¶¶ 64-66. On her eighth in-person attempt, GFH provided her with medical records that were "grossly incomplete" and contained "false information." *Id.* at ¶ 66. The amended complaint also alleges that GFH altered one of her requests for her medical records, replacing her name and date of birth with Baby A's, "to eliminate any evidence that [Plaintiff] had requested her own medical records." *Id.* at ¶ 65.

### III. DISCUSSION

**A.     Standard of Review**

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not

extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief,'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.* at 570.

**B.     The GFH Defendants' Motion to Dismiss**

The GFH Defendants argue that (1) Plaintiff lacks standing to assert an ADA or Rehabilitation Act Claim; (2) Plaintiff fails to plausibly allege that she is disabled within the meaning of the ADA or Rehabilitation Act; (3) Plaintiff fails to plausibly allege a discriminatory

act by GFH under the the ADA or Rehabilitation Act; (4) the Court should decline to exercise supplemental jurisdiction over Plaintiff's state law claims; and (5) Plaintiff's state law claims should be dismissed for failing to state a plausible claim. *See* Dkt. No. 26-1. Plaintiff opposes the GFH Defendants' motion in all respects. *See* Dkt. No. 35.

### 1. Plaintiff's ADA and Rehabilitation Act Claims

#### a. Standing

"'[T]o establish standing, a plaintiff must show (i) that he [or she] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief.'" *Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 74 (2d Cir. 2022) (quoting *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021)). "A plaintiff pursuing injunctive relief may not rely solely on past injury, but also must establish that '[he or] she is likely to be harmed again in the future in a similar way.'" *Id.* (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016)). "Such 'threatened injury must be *certainly impending* to constitute injury in fact, and ... allegations of *possible* future injury are not sufficient.'" *Id.* (quoting *Am. Civ. Liberties Union v. Clapper*, 785 F.3d 787, 800 (2d Cir. 2015)) (emphasis in original).

With respect to the ADA, the Second Circuit has "previously found standing (and therefore an injury in fact) where (1) the plaintiff alleged past injury under the ADA; (2) it was reasonable to infer that the discriminatory treatment would continue; and (3) it was reasonable to infer, based on the past frequency of [the] plaintiff's visits and the proximity of [the] defendants' [businesses] to [the] plaintiff's home, that [the] plaintiff intended to return to the subject location." *Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 187-88 (2d Cir. 2013) (citation omitted). The "central inquiry" is whether, when "'examined under the totality of all relevant facts,' the plaintiff

10

plausibly alleges 'a real and immediate threat of future injury.'" *Calcano*, 36 F.4th at 75 (quotation omitted).

The Court finds that the allegations in the amended complaint are sufficient to establish standing to seek injunctive relief under the ADA. Plaintiff satisfied the first requirement, a past injury, by alleging that GFH, through its policies and employees, engaged in a number of specific discriminatory acts because of Plaintiff's substance abuse disorder, in violation of the ADA. *See* Dkt. No. 14 at ¶ 80. The amended complaint also established a reasonable inference that the alleged discriminatory treatment will continue by alleging that Plaintiff was informed by GFH staff that it is GFH policy to both drug test and report for possible child abuse every pregnant women who takes Suboxone or Subutex. *See id.* at ¶ 35, 60. Finally, the amended complaint has plausibly demonstrated Plaintiff's intent to return to GFH. Specifically, Plaintiff alleges that (1) GFH is the only hospital within a fifteen-mile radius of her home; (2) Plaintiff has received at least two surgeries there and been admitted to its emergency room on at least one occasion previously; (3) since the events underlying this claim, Plaintiff has already had to return to GFH with Baby A's father during an emergency because "there are no other realistic options for emergency medical care"; and (4) Plaintiff "is still very much of the age range where having another baby is a possibility." Dkt. No. 14 at ¶¶ 2, 22, 75.

Accordingly, the GFH Defendants' motion to dismiss is denied to the extent it seeks to dismiss Plaintiff's ADA claim for lack of standing.

### b. Does the Amended Complaint State an ADA or Rehabilitation Act Claim

Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns,

11

leases (or leases to), or operates a place of public accommodation."  42 U.S.C. § 12182(a).  Section 504 of the Rehabilitation Act similarly provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  "'As the "standards adopted by the two statutes are nearly identical, [courts] consider the merits of these claims together."'"  *Am. Council of Blind of New York, Inc. v. City of New York*, 495 F. Supp. 3d 211, 229 (S.D.N.Y. 2020) (quoting *Disabled in Action v. Bd. of Elections in N.Y.*, 752 F.3d 189, 196 (2d Cir. 2014)).

To assert a claim under the ADA, a plaintiff must establish "that (1) they are 'qualified individuals' with a disability; (2) that the defendants are subject to the ADA; and (3) that plaintiffs were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiffs' disabilities.'"  *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272-73 (2d Cir. 2003).  To recover under the Rehabilitation Act, a plaintiff must additionally "show that the defendants receive federal funding."  *Id.* at 272.

### *i. Is Plaintiff a Qualified Individual with a Disability*

Under the ADA, the term "disability" is defined as follows:

> The term 'disability' means, with respect to an individual—
>
> (A) a physical or mental impairment that substantially limits one or more life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment (as described [elsewhere in the statute]).

42 U.S.C. § 12102(1).  The ADA further provides that the "definition of disability in this chapter

shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." *Id.* § 12102(4)(A). Plaintiff argues that the amended complaint has pled sufficient facts to satisfy both subsections (A) and (C). *See* Dkt. No. 35 at 16-19.

For the purposes of subsection A, "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working," 42 U.S.C. § 12102(2)(A), or "the operation of a major bodily function," *id.* § 12102(2)(B).

Additionally, the "term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA" and "is not meant to be a demanding standard." 28 C.F.R. § 35.108; *see also* 42 U.S.C. § 12102(4)(B); *Hamilton v. Westchester Cnty.*, 3 F.4th 86, 92 (2d Cir. 2021). However, "'a plaintiff [must] do more than simply allude to [his] impairments in [his] pleading; [ ]he must plead *how* those impairments significantly impacted [his] major life activities, or [ ]he will not survive a motion to dismiss.'" *Smeraldo v. Jamestown Pub. Sch.*, No. 21-CV-578, 2022 WL 992791, *4 (W.D.N.Y. Mar. 31, 2022) (quotation omitted).

The Court finds that the amended complaint has plausibly alleged that Plaintiff is a qualified individual with a disability under 42 U.S.C. § 12102(1)(A). The Second Circuit has repeatedly held that "drug addiction[ ] is an 'impairment' under the definitions of a disability set forth in ... the ADA[ ] and the Rehabilitation Act." *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 46 (2d Cir. 2002) (citing *Buckley v. Consol. Edison Co.*, 155 F.3d 150, 154 (2d Cir. 1998); *Teahan v. Metro–North Commuter R.R. Co.*, 951 F.2d 511, 518 (2d

Cir. 1991)). Furthermore, the amended complaint has done more than merely allege that Plaintiff was addicted to drugs in the past; it has set forth the specific effects her addiction has when it is untreated (hallucinations, paranoia, severe anxiety, and panic attacks) on several major life activities identified in Section 12102(2)(A) (the ability to care for herself, as well as her physical and mental functioning). *See* Dkt. No. 14 at ¶ 29.

The GFH Defendants argue that the amended complaint fails to establish that Plaintiff's addiction significantly impacted a major life activity because (1) the alleged impairment occurs only when Plaintiff is untreated and off her medication, and (2) the amended complaint "makes clear that she has received treatment for opiate use for close to a decade and 'is no longer using illicit opioids.'" Dkt. No. 26-1 at 16. However, the ADA specifically provides that an "impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D). It is true that the amended complaint does not explicitly allege that Plaintiff's substance abuse disorder is episodic. However, the amended complaint does clearly provide that Plaintiff "still has substance abuse disorder," "still requires treatment," and had been taking Subutex, a medication for treating substance abuse disorders, for more than a decade. Dkt. No. 14 at ¶¶ 28-29. These allegations give rise to a reasonable inference that Plaintiff was, during the time period relevant to this case, at risk for relapse or remission. Thus, after "accepting all factual allegations in the [amended] complaint and drawing all reasonable inferences in ... [P]laintiff's favor," *ATSI Commc'ns, Inc.*, 493 F.3d at 98, the Court finds that the amended complaint plausibly alleges that Plaintiff is a qualified individual with a disability under 42 U.S.C. § 12102(1)(A).

Alternatively, the Court finds that the amended complaint has plausibly alleged that Plaintiff is a qualified individual with a disability under 42 U.S.C. § 12102(1)(C). Under

subsection C, "[a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A); *see also Hilton v. Wright*, 673 F.3d 120, 129 (2d Cir. 2012). The amended complaint alleges that, after Plaintiff told Nurse Ralph that she was taking Subutex twice a day, Nurse Ranttila (1) asked Plaintiff, "Are you sure you didn't do cocaine before coming in?"; (2) informed Plaintiff that, despite her lack of consent, GFH drug tests pregnant women who take Suboxone or Subutex "all the time"; and (3) informed Plaintiff that GFH compares Subutex patients' prescribed dosage against the levels in their system to try to determine whether they are illegally selling their pills. Dkt. No. 14 at ¶ 35. Additionally, even after Plaintiff's second drug test came back negative, GFH staff continued to withhold an epidural and Nurse Ranttila and Nurse Nix collected Baby A's urine and meconium to run even more toxicology tests over Plaintiff's protests. *See id.* at ¶¶ 36, 41. Treating these allegations as true, Plaintiff has plausibly alleged that the GFH Defendants considered Plaintiff to be a active drug user for the duration of her time at the hospital, and that this belief significantly informed many of their actions during the course of their treatment of Plaintiff.

Accordingly, the Court finds that Plaintiff has adequately alleged that she is a qualified individual with a disability within the meaning of the ADA and Rehabilitation Act.

### ii. Is GFH Subject to the ADA and the Rehabilitation Act

The GFH Defendants concede that GFH is a public accommodation for the purposes of the ADA. *See* Dkt. No. 26-1 at 13 n.2 (citing 42 U.S.C. § 12181(7)(F)). The GFH Defendants do not explicitly address the Rehabilitation Act's federal funding requirement, but also fail to raise it

as a ground for dismissal. *See id.* at 22-24; see also Dkt. No. 14 at ¶ 85 (alleging that "GFH receives federal financial assistance through federal grants and through Medicaid and Medicare reimbursement").

Accordingly, the Court finds that the Amended Complaint has adequately alleged that GFH is subject to the ADA and the Rehabilitation Act.

### *iii. Was Plaintiff Discriminated Against by the GFH Defendants by Reason of Her Disability?*

"[A] plaintiff pleads an actionable claim of discrimination in the medical treatment context under the ADA or the Rehabilitation act if she alleges that the defendants made treatment decisions based on factors that are 'unrelated to, and thus improper to consideration of' the inquiry in question." *McGugan v. Aldana-Bernier*, 752 F.3d 224, 234 (2d Cir. 2014) (quoting *United States v. Univ. Hosp., State Univ. of New York at Stony Brook*, 729 F.2d 144, 156 (2d Cir. 1984)). Put another way, "a medical decision to administer (or to withhold) a treatment in the case of a disabled person could constitute discrimination that is actionable under [the ADA or the Rehabilitation Act] if the decision was motivated by considerations that are unrelated to proper medical decision-making about the case." *Id.* at 232; *see also Sawabini v. McConn*, No. 5:20-CV-1157, 2021 WL 878731, *3 (N.D.N.Y. Mar. 9, 2021) ("[A] plaintiff cannot bring a discrimination claim under the federal disability statutes absent some plausible indication that the doctor has inflicted or withheld treatment 'for reasons having no relevance to medical appropriateness'") (quoting *McGugan*, 752 F.3d at 231). "To hold otherwise would 'federalize many (if not most) claims for medical malpractice.'" *Sawabini*, 2021 WL 878731, at *3 (quoting *McGugan*, 752 F.3d at 234).

The amended complaint alleges that GFH, through its policies and employees, engaged in

16

the following discriminatory acts because of Plaintiff's substance abuse disorder:

> (1) conducted improper and unlawful drug tests of [Plaintiff] and Baby A without obtaining [Plaintiff's] informed consent; (2) reported [Plaintiff] to state authorities alleging suspected child abuse, under the cover of a knowingly false positive drug screening test; (3) withheld pain relief and an epidural from [Plaintiff]; (4) forcefully induced labor without [Plaintiff's] informed consent; (5) refused to let [Plaintiff] and Baby A leave the hospital under false pretenses; [and] (6) refused to explain alternatives to Baby A's treatment or why he had to remain in the hospital ... .

Dkt. No. 14 at ¶ 80. Initially, the Court finds that a number of these alleged acts were medical determinations motivated by considerations relevant to proper medical decision-making. In particular, the decisions to (1) drug test Plaintiff after she informed them that she was taking Subutex; (2) withhold pain relief and an epidural; (3) forcefully induce labor; and (4) not explain alternatives to Baby A's treatment,[1] are all clearly determinations related to providing Plaintiff medical care. The Court has little doubt that whether or not an expectant mother is actively using controlled substances is a medically pertinent consideration to that mother's labor and delivery. Indeed, even if one or more of these acts were fairly considered "reprehensible and [medical] malpractice," they still would "not constitute actionable discrimination" under the ADA and the Rehabilitation Act. *McGugan*, 752 F.3d at 231-32 (noting that a "flawed" medical analysis "may be malpractice, but it is not discrimination"); *see also Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 486 n.6 (7th Cir. 2019) ("The Rehabilitation Act and the [ADA] do not create a remedy for medical malpractice").

The remaining alleged discriminatory acts, although not medical determinations, also fail to establish that GFH discriminated against Plaintiff by reason of her disability. First, as the

---

[1] Although it is not abundantly clear from the amended complaint what specific treatment Plaintiff wanted alternatives to, the Court assumes Plaintiff is referring to the decision to use a non-portable incubator to treat Baby A's jaundice. *See* Dkt. No. 14 at ¶ 42.

Case 1:22-cv-00296-MAD-CFH   Document 63   Filed 02/15/23   Page 18 of 20

amended complaint states, Social Worker Deschene's decision to report suspected child abuse was made on the basis of Plaintiff's first drug test, which had just come back positive. *See* Dkt. No. 14 at ¶ 49.[2] Similarly, even assuming that the complaint is correct that GFH's real purpose in keeping Plaintiff in the hospital was to provide a CPS worker the opportunity to question her about her positive drug test, the refusal to discharge her was still motivated by an ongoing CPS investigation—not discriminatory animus. *See id.* at ¶¶ 48-49. Finally, contrary to the claim that GFH staff refused to explain why Baby A had to remain in the hospital, the amended complaint specifically states that Dr. Grassi told Plaintiff that Baby A was not permitted to leave the hospital "until CPS had inspected [Plaintiff's] home and cleared her to bring Baby A home." *Id.* at ¶ 60. Thus, as above, the amended complaint makes it clear that this determination was made in response to the ongoing CPS investigation rather than motivated by Plaintiff's disability.

In sum, the Court finds that the amended complaint failed to adequately allege that Plaintiff was discriminated against by reason of her disability. Accordingly, the GFH Defendants' motion to dismiss Plaintiff's ADA and Rehabilitation Act claims is granted.

### 2. Plaintiff's State Law Claims

Plaintiff's nine remaining claims—medical malpractice, negligence, false imprisonment, assault and battery, intentional infliction of emotional distress, negligent infliction of emotional distress, and violations of New York Public Health Law, New York Human Rights Law, and New York General Business Law—all arise from New York state law. Where, as here, a district court has dismissed all claims over which it has original jurisdiction, the court may decline to exercise supplemental jurisdiction over remaining state-law claims. *See* 28 U.S.C. § 1367(c)(3); *United*

---

[2] The Court also notes that Social Worker Deschene is a mandated reporter under New York Law. *See* N.Y. Soc. Serv. Law § 413.

*Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *Klein & Co. Futures, Inc. v. Bd. of Trade of City of New York*, 464 F.3d 255, 262 (2d Cir. 2006). The decision is a discretionary one, and its justification "lies in considerations of judicial economy, convenience and fairness to litigants[.]" *United Mine Workers of Am.*, 383 U.S. at 726; *see also Kolari v. New York–Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional 'values of judicial economy, convenience, fairness, and comity,' in deciding whether to exercise jurisdiction") (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). "'[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors ... will point toward declining to exercise jurisdiction over the remaining state-law claims.'" *Kolari*, 455 F.3d at 122 (quoting *Cohill*, 484 U.S. at 350 n.7).

Here, after carefully considering the relevant factors, *i.e.*, economy, convenience, fairness, and comity, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims. *See Kolari*, 455 F.3d at 122 ("'Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.... [I]f the federal law claims are dismissed before trial ... the state claims should be dismissed as well'") (quoting *Gibbs*, 383 U.S. at 726).

Accordingly, the GFH Defendants' motion to dismiss Plaintiff's state law claims is granted.[3]

### IV. CONCLUSION

---

[3] The motions to dismiss by Midwife Bennett, *see* Dkt. No. 47, and Nurse Ranttila, *see* Dkt. No. 50, are also granted to the extent they seek dismissal of Plaintiff's state law claims for lack of subject matter jurisdiction under 28 U.S.C. § 1367(c)(3), for the reasons set forth above. The United States' motion to substitute itself as the party defendant in place and stead of Midwife Biss and to dismiss the complaint is denied as moot.

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that the GFH Defendants' motion to dismiss (Dkt. No. 26), Midwife Bennett's motion to dismiss (Dkt. No. 47), and Nurse Ranttila's motion to dismiss (Dkt. No. 50) are **GRANTED**;[4] and the Court further

**ORDERS** that the United States' motion to substitute and dismiss the complaint (Dkt. No. 61) is **DENIED as moot**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules

**IT IS SO ORDERED.**

Dated: February 15, 2023
　　　　Albany, New York

Mae A. D'Agostino
U.S. District Judge

---

[4] Plaintiff's state law claims are dismissed without prejudice.