**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**NICOLE COSTIN,** *individually and on behalf of*
*her minor son*, *BABY A*,

|  |  |
|---|---|
| **Plaintiffs,** | |
| **vs.** | **1:22-CV-296** |
| | **(MAD/CFH)** |
| **GLENS FALLS HOSPITAL,** *et al.*, | |
| **Defendants.** | |

_____

| **APPEARANCES:** | **OF COUNSEL:** |
|---|---|
| **SCHULTE ROTH & ZABEL LLP** | **TALEAH E. JENNINGS, ESQ.** |
| 919 Third Avenue | **HAMDI SOYSAL, ESQ.** |
| New York, New York 10022 | **SHANNON B. WOLF, ESQ.** |
| Attorneys for Plaintiff | **WILLIAM H. GUSSMAN, ESQ.** |
| | |
| **FRESHFIELDS US LLP** | **FRANCES RODRIGUEZ, ESQ.** |
| 3 World Trade Center | |
| 175 Greenwich Street, 51st Floor | |
| New York, New York 10007 | |
| Attorney for Plaintiff | |
| | |
| **MCPHILLIPS, FITZGERALD LAW FIRM** | **ERIC C. SCHWENKER, ESQ.** |
| 288 Glen Street | |
| P.O. Box 299 | |
| Glens Falls, New York 12801 | |
| Attorney for Defendants Glens Falls Hospital, | |
| Kevin M. Grassi, Stacey L. Ralph, Jennifer | |
| Nix, Amy Hooper, Jodie Smith, Stephanie | |
| Dechene, and Alycia N. Gregory | |
| | |
| **REBAR KELLY** | **CATHLEEN KELLY REBAR, ESQ.** |
| 470 Norristown Road | **PATRICK J. HEALEY, ESQ.** |
| Suite 201 | |
| Blue Bell, Pennsylvania 19422 | |
| Attorneys for Defendant Karen Ranttila | |
| | |
| **OFFICE OF THE UNITED STATES** | **C. HARRIS DAGUE, AUSA** |
| **ATTORNEY** | |

James T. Foley U.S. Courthouse
445 Broadway, Room 218
Albany, NY 12207
Attorney for Defendant Lynette M. Biss

**MARTIN CLEARWATER**         **CHRISTOPHER J. DANIEL, ESQ.**
**& BELL LLP**
245 Main Street
Suite 501
White Plains, New York 10601
Attorney for Defendant Nicole Bennett

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Plaintiff, Nicole Costin, on behalf of herself and her minor son, Baby A, initiated this action by filing a complaint on March 28, 2022. *See* Dkt. No. 1. Plaintiff named Defendants Glens Falls Hospital (the "Hospital" or "GFH"), Kevin M. Grassi, M.D., and Jane Does 1-7 and alleged that Defendants violated her rights under the Americans with Disabilities Act ("ADA") when Plaintiff and her partner, Solomon Gonzalez, chose to deliver Baby A at the Hospital. *See id.* Plaintiff also asserted numerous state court claims. *See id.* Plaintiff filed an amended complaint on June 23, 2022. *See* Dkt. No. 14. Plaintiff alleges the same factual background as her original complaint, but identifies the Jane Doe Defendants as Stacy L. Ralph, R.N., Karen Ranttila, R.N., Lynette M. Biss, C.N.M., Nicole Bennett, C.N.M., Jennifer Nix, R.N., Amy Hooper, R.N., Jodie Smith, R.N., Stephanie Dechene, LCSW-R, and Alycia N. Gregory, LMSW. *See id.* Plaintiff alleges violations of the ADA, the Rehabilitation Act ("RA"), and New York State laws. *See id.*

Defendants moved to dismiss the amended complaint. *See* Dkt. Nos. 26, 35, 47, 49, 50, 61. The Court granted the motions and entered judgment in Defendants' favor. *See* Dkt. Nos. 63,

64.  In doing so, the Court dismissed Plaintiff's federal claims and declined to exercise supplemental jurisdiction over the state law claims.  *See* Dkt. No. 63 at 18-19.  Plaintiff appealed the judgment to the Second Circuit.  *See* Dkt. No. 65.  The Second Circuit vacated in part this Court's dismissal of Plaintiff's ADA and RA claims and, in turn, also vacated the Court's decision declining to exercise supplemental jurisdiction.  *See* Dkt. No. 67.

Defendants subsequently filed an answer to Plaintiff's amended complaint.  *See* Dkt. No. 70.  On August 2, 2024, Defendants Karen Ranttila and Nicole Bennett separately moved to dismiss Plaintiff's state law claims.  *See* Dkt. Nos. 72, 73.  Plaintiff responded in opposition, *see* Dkt. Nos. 75, 76, and Defendants replied.  *See* Dkt. No. 77 and 78.

For the following reasons, the motions are denied.

## II. BACKGROUND[1]

Defendant Ranttila is a Registered Nurse who was employed by the Hospital at all relevant times.  *See* Dkt. No. 14 at ¶ 11.  Defendant Bennett is a Certified Nurse Midwife but was a Student Nurse Midwife during the times underlying this case.  *See id.* at ¶ 13.

Plaintiff alleges that she chose to deliver Baby A at the Hospital because she had previously received services there, it was fifteen miles from her home, and it publicized itself as a top choice for expecting mothers.  *See id.* at ¶ 22.  Plaintiff's water broke on March 29, 2021, at 12:30 PM.  *See id.* at ¶ 24.  Plaintiff was 38.5 weeks pregnant.  *See id.*  Plaintiff and Mr. Gonzalez checked into the Hospital's Joyce Stock Snuggery at 2:00 PM.  *See id.*  Plaintiff was first met by Defendant Ralph who obtained Plaintiff's personal and medical history.  *See id.* at ¶¶ 26-27.  Plaintiff denied smoking cigarettes, but Defendant Ralph "indicated in her medical records that

---

[1] The factual recitation is derived from Plaintiff's amended complaint.  *See* Dkt. No. 14. The Court recites only those facts that are relevant to the pending motions to dismiss.

3

Ms. Costin engaged in 'maternal tobacco use.'" *Id.* at ¶ 27.  Plaintiff informed Defendant Ralph

that she was taking Subutex as prescribed by her primary care physician for her substance abuse

disorder.  *See id.* at ¶ 28.  Plaintiff states that substance abuse disorder is a disability under the

ADA and RA.  *See id.* at ¶ 29.  Plaintiff explains that she previously took Suboxone, but her

primary care physician changed her medication to Subutex when Plaintiff became pregnant.  *See*

*id.* at ¶ 28.  Plaintiff's substance abuse disorder stems from an addiction to opioids.  *See id.* at ¶

29.  Plaintiff informed Defendant Ralph that she wanted an epidural during labor.  *See id.* at ¶ 27.

At 7:00 PM, there was a shift change at which time Defendant Ranttila took over for

Defendant Ralph.  *See id.* at ¶ 31.  Defendant Ralph informed Defendant Ranttila about Plaintiff's

Subutex use and that he was waiting for the results of a urine toxicology screen.  *See id.* at ¶¶ 31-

32.  Plaintiff was "surprise[d]" by Defendant Ralph running a toxicology screen because "she

assumed [the urine sample] was for the same reasons she had provided urine samples during

prenatal examinations, *i.e.*, to check the levels of sugar and protein in her urine.  No one had

informed [Plaintiff] that the hospital was performing a drug test on her urine.  Nor, to her

knowledge, did she consent to any such test."  *Id.* at ¶ 32.

Plaintiff's contractions were becoming increasingly painful, and she asked Defendant

Ranttila to prepare an epidural.  *See id.* at ¶ 33.  Plaintiff's "contractions were so intense that [she]

went in and out of consciousness and temporarily lost her sight and hearing. One contraction was

so painful that [Plaintiff], who was in the bathroom at the time, dropped to the floor."  *Id.*

Defendant "Ranttila informed [Plaintiff] that the hospital's anesthesiologist was on call and that

she would contact him to get the epidural process started.  Throughout [Defendant] Ranttila's

shift, [Defendant] Biss and [Defendant] Bennett periodically entered Ms. Costin's hospital room

to check her dilation."  *Id.*  While waiting for the anesthesiologist, Defendant Bennett, then a

Student Nurse Midwife, came into Plaintiff's room and stated that Plaintiff's "urine test came back with positive results for both cocaine and PCP." *Id.* at ¶ 34. Plaintiff argued that the test was incorrect and asked for Defendant Ranttila to redo the test. *See id.* Plaintiff continued asking for an epidural but was denied. *See id.* at ¶ 35.

Defendant Ranttila collected a second urine sample from Plaintiff. *See id.* "While doing so, Nurse Ranttila smirked and asked [Plaintiff], 'Are you sure you didn't do cocaine before coming in?'" *Id.* "Nurse Ranttila also informed [Plaintiff] that, despite [Plaintiff] informing her that she never consented to an initial drug screen, GFH drug tests pregnant women who take Suboxone or Subutex 'all the time.' She also disclosed that GFH compares Subutex patients' prescribed dosage against the levels in their system to try to determine whether they are illegally selling their pills." *Id.* "Approximately one hour later, [Defendant] Bennett entered [Plaintiff's] hospital room and informed her that the second urine collection tested negative for all substances." *Id.* at ¶ 36. "Nurse Ranttila then informed [Plaintiff] that GFH was withholding the epidural, and she would not be receiving it." *Id.*

Defendant Biss reiterated the Plaintiff would not receive an epidural. *See id.* at ¶ 37. "[O]ther GFH nurses connected bags of unidentified fluids to [Plaintiff's] IV drip." *Id.* Defendant "Ranttila stated that they were waiting for [Plaintiff] to 'finish the bag' they had connected to her IV and started squeezing on the bag." *Id.* Plaintiff "wanted an epidural and did not want to rush into labor. It was too late." *Id.* Baby A was born on March 29, 2021, at 10:14 PM. *See id.* at ¶ 38. As a result of this series of events, "several inches of [Plaintiff's] body were ripped open during delivery," and Baby A had a completely bruised face and the blood vessels in his eyes were burst. *Id.* The birth was labeled a "violent birth." *Id.*

Plaintiff alleges that her pain "was so severe that she was quivering and barely had the strength to hold" Baby A. *Id.* at ¶ 39. Defendant Ranttila removed Baby A from Plaintiff's arms and Defendants Biss and Bennett began to repair Plaintiff's vaginal tear. *See id.* at ¶ 40. Plaintiff "used all the strength she had left to protest, relentlessly yelling across her body for them to stop." *Id.* Defendants did not stop nor numb Plaintiff for any of the procedure and "she could see [Defendant] Bennett (who, again, was a student at the time) was performing the procedure, despite [Plaintiff's] repeated insistence upon entering the Snuggery that no student perform any medical examinations on her." *Id.*

Defendant Nix came into Plaintiff's room. *See id.* at ¶ 41. Defendants Nix and Ranttila collected urine and fecal samples from Baby A to run a toxicology screen. *See id.* Plaintiff did not consent to the testing, but Defendants told her she did not have a choice. *See id.* Defendants Nix and Ranttila placed Baby A into an incubator because of severe jaundice. *See id.* at ¶ 42. Plaintiff alleges that Baby A remained in the incubator for several days during which Plaintiff could only touch him through holes in the box. *See id.* She contends that this was despite the availability of a portable machine that the Hospital owned which could have allowed Plaintiff to hold Baby A while he underwent treatment. *See id.* Plaintiff alleges that the Hospital "needlessly prevented Ms. Costin and Baby A from having maximum skin-to-skin contact for several days." *Id.*

The next day, on March 30, 2021, at 9:00 AM, Plaintiff asked Defendant Hooper if she could go home to take a shower. *See id.* at ¶ 46. Defendant Hooper told Plaintiff she could not leave. *See id.* The same thing happened the following day but with Defendant Smith. *See id.* at ¶ 48.

6

Unbeknownst to Plaintiff, Defendant Deschene, a Social Worker, "contacted the New York State Child Abuse and Maltreatment Register to report suspicions that [Plaintiff] was 'responsible for causing or allowing to be inflicted injury, abuse, or maltreatment.'" *Id.* at ¶ 49. The Hospital required Plaintiff to remain in the Hospital until a representative from Warren County Child Protective Services ("CPS") could arrive to speak with her. *See id.* At approximately 4:00 PM, Annamarie Ackerman with CPS arrived to speak with Plaintiff. *See id.* at ¶ 53. Ms. Ackerman asked Plaintiff and Mr. Gonzalez to submit urine samples. *See id.* Plaintiff was then permitted to leave and go home to take a shower. *See id.* at ¶ 55. She "rushed back to the hospital. When she arrived at the hospital, she asked for a meeting to discuss the hospital's mistreatment of her." *Id.*

On April 1, 2021, Plaintiff and her mother met with Hospital representatives. *See id.* at ¶ 56. Following their discussion, Plaintiff asked to take Baby A home, which Defendant Grassi denied. *See id.* at ¶ 60. Defendant Grassi told Plaintiff "she was not permitted to leave the hospital with Baby A until CPS had inspected her home and cleared her to bring Baby A home. . . . Dr. Grassi informed her that the hospital reports possible child abuse by every patient that comes in on Suboxone." *Id.* The CPS case was eventually closed as unfounded. *See id.* at ¶ 62.

Plaintiff brings medical malpractice, lack of informed consent, intentional infliction of emotional distress, and negligent infliction of emotional distress claims against Defendant Ranttila; and an assault and battery claim against Defendant Bennett.

### III. DISCUSSION

**A.    Legal Standard**

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v.*

*Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted).  In considering the legal

sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all

reasonable inferences in the pleader's favor.  *See ATSI Commc'ns, Inc. v. Shar Fund, Ltd.*, 493

F.3d 87, 98 (2d Cir. 2007) (citation omitted).  This presumption of truth, however, does not

extend to legal conclusions.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the

claim," *see* FED. R. CIV. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is

entitled to relief.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted).

Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief

above the speculative level," *see id.* at 555 (citation omitted), and present claims that are

"plausible on [their] face," *id.* at 570.  "The plausibility standard is not akin to a 'probability

requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."

*Iqbal*, 556 U.S. at 678 (citation omitted).  "Where a complaint pleads facts that are 'merely

consistent with' a defendant's liability, it 'stops short of the line between possibility and

plausibility of "entitlement of relief."'"  *Id.* (quoting *Twombly*, 550 U.S. at 557). Ultimately,

"when the allegations in a complaint, however true, could not raise a claim of entitlement to

relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line

from conceivable to plausible, the[ ] complaint must be dismissed."  *Id.* at 570.

**B.      Assault and Battery Claim Against Defendant Bennett**

Defendant Bennett argues "that the act of repairing the Plaintiff's vaginal tearing caused

by the delivery of Baby A was a medical procedure that conferred a medical benefit upon the

Plaintiff.  As such, Nurse Bennett did not possess the requisite intent necessary for the Plaintiff's

assault and battery claims to survive scrutiny under Rule 12(b)(6)."  Dkt. No. 73-2 at 8.  Plaintiff

argues that she has sufficiently alleged that Defendant Bennett intended to make contact with her body to which she did not consent, which is all that is required for pleading an assault and battery claim. *See* Dkt. No. 76 at 7-8.

"Under New York law, an 'assault' is an intentional placing of another person in fear of imminent harmful or offensive contact. A 'battery' is an intentional wrongful physical contact with another person without consent." *Vivar v. City of New York*, No. 18-CV-5987, 2020 WL 1505654, *15 (S.D.N.Y. Mar. 30, 2020) (quoting *D.K. by L.K. v. Teams*, 260 F. Supp. 3d 334, 364 (S.D.N.Y. 2017)) (additional quotation and quotation marks omitted). "[T]he common meanings of 'assault' and 'battery' subsume all forms of tortious menacing and unwanted touching." *Id.* (quoting, *inter alia*, *Girden v. Sandals Int'l*, 262 F.3d 195, 203 (2d Cir. 2001)) (additional quotation marks omitted); *see also Thaw v. N. Shore Univ. Hosp.*, 129 A.D.3d 937, 938-39 (3d Dept. 2015).

"The alleged contact 'must be one which would offend the ordinary person . . . not unduly sensitive as to his personal dignity. It must, therefore, be a contact which is unwarranted by social usages prevalent at the time and place at which it is inflicted.'" *Cohen v. Davis*, 926 F. Supp. 399, 402 (S.D.N.Y. 1996) (quoting Restatement (Second) of Torts § 19, cmt. a (Supp. 1996)). "[A] completely unpermitted touching by a medical practitioner of a patient is a battery . . . ." *Armstrong ex rel. Armstrong v. Brookdale Univ. Hosp. & Med. Ctr.*, 425 F.3d 126, 134 (2d Cir. 2005) (citations omitted). Accordingly, "battery applies in the medical context only where the patient or her guardian gives *no* consent and the doctor intends to 'cause a bodily contact that a reasonable person would find offensive.'" *Id.* (quotation omitted). "On the other hand, an informed consent violation occurs when the doctor obtains consent without giving the patient appropriate information concerning risks and alternatives." *Id.*

Plaintiff alleges that Defendant Bennett, alongside Defendant Biss, committed assault and battery "when they inserted a needle through her perineal area without her consent, and continued to do so over her express objection."  Dkt. No. 14 at ¶ 122.  Plaintiff contends that "[s]he was forced to undergo and recover from a painful procedure without any pain relief or numbing medication despite her objections."  *Id.* at ¶ 123.

Defendant Bennett attaches Plaintiff's "Informed Consent" form to her motion to support the argument that the touching was permitted.  *See* Dkt. No. 73-3 at 3.  Plaintiff signed and dated the form which described the anticipated procedure as a "vaginal delivery" and stated that Plaintiff "authorize[d] Dr. Leonard and whomever they may designate as their assistants, to administer such treatment as necessary and to perform the above procedure, and such additional operations or procedures as are considered necessary on the basis of the findings during the course of said operations upon [Plaintiff], a patient at Glens Falls Hospital."  *Id.*[2]

Plaintiff argues that "she made it well-known, after signing the hospital's admission forms, that she did not consent to any students, such as Defendant Bennett at the time, performing any

---

[2] "Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself."  *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).  However, a district court may also consider "documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citations omitted).  "Where a document is not incorporated by reference, the court may never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint."  *Id.* (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).  Other Defendants previously presented Plaintiff's consent forms as an exhibit to their motion to dismiss in July 2022.  *See* Dkt. No. 26-5.  Plaintiff did not then, and she does not now, object to the Court's consideration of the consent forms, despite them not being attached to her complaint.  Plaintiff does not mention her consent form in her complaint.  *See generally* Dkt. No. 14.  Nevertheless, because the consent form constitutes a contract under which Plaintiff's care with Defendants was established and which underlies this case, the Court will consider it in determining Defendant Ranttila's motion.  As set forth in the body of this Memorandum-Decision and Order, the consideration of the consent does not alter the outcome of the Court's decision on the motion to dismiss stage because Plaintiff has alleged that she either did not consent at all, or rescinded her consent, to specific procedures.

procedures." Dkt. No. 76 at 10 (citing Dkt. No. 14 at ¶¶ 26, 40, 57).  Plaintiff further contends that "[e]ven if [she] had not expressly limited her consent (to allow only non-student medical professionals to perform procedures upon her and Baby A), she unambiguously rescinded any consent she had previously given when Defendant Bennett began to penetrate her vaginal area with a sharp object and no pain medication."  *Id.* at 11.

The Court agrees with Defendant Bennett's contention, as set forth in her reply, that Plaintiff has not pled that she wanted the vaginal tear to remain unrepaired.  *See* Dkt. No. 77 at 7. Nevertheless, whether a reasonable person would find the conduct to be offensive or wrongful is a question of fact not suited for determination on a motion to dismiss.  *See Ramirez v. Temin & Co., Inc.*, No. 20-CV-6258, 2021 WL 4392303, *19 (S.D.N.Y. Sept. 24, 2021) (quoting *Cohen*, 926 F. Supp. at 402).  Plaintiff alleges that she did not give consent for Defendant Bennett to touch Plaintiff in any capacity and expressly and repeatedly objected to Defendant Bennett touching Plaintiff.  *See* Dkt. No. 14 at ¶¶ 40, 122-23.  Insofar as Defendant Bennett relies on the signed informed consent form, the trier of fact will be tasked with determining whether Plaintiff's verbal commands altered the extent of Plaintiff's consent.  At this early juncture and without the benefit of any medical records or depositions, Plaintiff has sufficiently alleged that she expressly declined consent to Defendant Bennett touching an extremely private area of Plaintiff's body.  Therefore, Defendant Bennett's motion is denied.  *See Tirado v. Koritz*, 156 A.D.3d 1342, 1343 (4th Dep't 2017) (quoting *VanBrocklen v. Erie County Med. Ctr.*, 96 A.D.3d 1394, 1395 (4th Dep't 2012)) (allowing battery claim to proceed where "plaintiffs allege in the complaint that 'defendant physician knew that . . . she was exceeding the scope of . . . plaintiff's consent by performing a medical procedure that . . . plaintiff had not authorized'"); *see also McCarthy v. Shah*, 162 A.D.3d 1727, 1729 (4th Dep't); *Cerilli v. Kezis*, 16 A.D.3d 363 (2d Dep't 2005).

11

**C.     State Law Claims Against Defendant Ranttila**

   *1.  Medical Malpractice*

   "Under New York law, the 'essential elements of medical malpractice are (1) a deviation or departure from accepted medical practice, and (2) evidence that such departure was a proximate cause of injury.'"  *Doane v. United States*, 369 F. Supp. 3d 422, 446 (N.D.N.Y. 2019) (quoting *DiMitri v. Monsouri*, 302 A.D.2d 420, 421 (2d Dep't 2003)).  "A defendant's negligence qualifies as a proximate cause where it is 'a substantial cause of the events which produced the injury.'"  *Mazella v. Beals*, 27 N.Y.3d 694, 705 (2016) (quoting *Derdiarian v. Felix Contr. Corp.*, 51 N.Y.2d 308, 315 (1980)).  "However, '[w]here the acts of a third person intervene between the defendant's conduct and the plaintiff's injury, the causal connection is not automatically severed.'"  *Id.* (quotation omitted).  "As [the New York Court of Appeals] has explained, 'liability turns upon whether the intervening act is a normal or foreseeable consequence of the situation created by the defendant's negligence.'"  *Id.* (quotations omitted).  "Only where 'the intervening act is extraordinary under the circumstances, not foreseeable in the normal course of events, or independent of or far removed from the defendant's conduct,' may it possibly 'break[ ] the causal nexus.'"  *Id.* (quotation omitted).  "The mere fact that other persons share some responsibility for plaintiff's harm does not absolve defendant from liability because 'there may be more than one proximate cause of an injury.'"  *Id.* (quoting *Argentina v. Emery World Wide Delivery Corp.*, 93 N.Y.2d 554, 560 n.2 (1999)).

   Defendant Ranttila argues that Plaintiff's amended complaint fails to state a medical malpractice claim.  *See* Dkt. No. 72-2 at 9.  Defendant Ranttila contends that Plaintiff has failed to plausibly allege an injury proximately caused by Defendant Ranttila's conduct.  *See id.* at 10.  Defendant Ranttila obtained the second urine sample from Plaintiff, but she argues that "Plaintiff

fails to plead any plausible, cognizable injury suffered by Plaintiff or Baby A that was proximately caused by a negative drug test, nor can she." *Id.* Defendant Ranttila states that "[t]he Complaint is devoid of any plausible allegation that Baby A suffered any physical and/or psychological harm arising from the collection and testing of [Plaintiff or Baby A's] urine without consent." *Id.*

Plaintiff explains that her medical malpractice claim concerns only the drugs tests performed on Baby A following the birth. *See* Dkt. No. 75 at 10-11. Plaintiff argues that Defendant Ranttila's conduct led to physical and emotional injuries by depriving Baby A of skin-to-skin contact with Plaintiff, and Plaintiff being unable to produce breastmilk, get out of bed, sleep, "and live a normal, functional life." *Id.* at 11; *see also* Dkt. No. 14 at ¶¶ 71-75.

As to Plaintiff's alleged emotional injuries, courts have explained that "where . . . an infant is injured in utero as a result of medical malpractice and is born alive, the mother cannot recover damages for emotional injuries without having sustained an independent injury as a result of the alleged malpractice." *Brashaw v. Cohen*, 154 A.D.3d 1327, 1328-29 (4th Dep't 2017) (citing *Sheppard-Mobley ex rel. Mobley v. King*, 4 N.Y.3d 627, 636 (2005)). "Absent an independent injury, the mother can recover damages for emotional injuries arising from medical malpractice that causes an in utero injury only if that malpractice results in miscarriage or stillbirth." *Id.*; *see also SanMiguel v. Grimaldi*, 229 A.D.3d 152, 165-66 (1st Dep't 2024). The alleged medical malpractice in delivering Baby A did not result in a miscarriage or stillbirth. Nevertheless, because Plaintiff has alleged an independent physical injury—an inability to breastfeed which caused significant physical pain—the Court rejects Defendant Ranttila's argument on this issue at this time.

Defendant Ranttila argues that Plaintiff's allegation that the urine analysis was "unlawful" is a conclusory allegation that should be rejected by the Court. Dkt. No. 72-2 at 10. Defendant Ranttila is correct that legal conclusions masked as factual allegations are insufficient to withstand a motion to dismiss. *See id.* at 8; *see also Papasan v. Allain*, 478 U.S. 265, 286 (1986) ("Although for the purposes of this motion to dismiss we must take all the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation"). However, Plaintiff alleges that despite her testing negative for any illicit substances, *see* Dkt. No. 14 at ¶ 36, Defendant Ranttila took fecal and urine samples from Baby A. *See id.* at ¶ 41. Defendant Ranttila argues that "collecting [Baby A's] urine and fecal samples alone does not constitute medical treatment that a patient 'undergoes' under" New York Public Health Law. Dkt. No. 72-2 at 13 (quotation omitted).

Defendant Ranttila is correct that New York Public Health Law states as follows:

> The right of action to recover for medical, dental or podiatric malpractice based on a lack of informed consent is limited to those cases involving either (a) non-emergency treatment, procedure or surgery, or (b) a diagnostic procedure which involved invasion or disruption of the integrity of the body.

N.Y. Pub. Health Law § 2805-d(2). The statute does not further define the word "procedure." *See id.* § 2801. Defendant Ranttila cites *Hecht v. Kaplan*, 221 A.D.2d 100 (2d Dep't 1996), in which the court stated that "merely drawing an extra tube of blood during the course of *an otherwise proper blood test*, even for the purpose of performing unauthorized testing upon it, does not constitute an affirmative violation of the [patient's] physical integrity." Dkt. No. 72-2 at 13 (emphasis added).

Here, Plaintiff does not allege "an otherwise proper [] test." *Id.* She contends that Defendants Ranttila and Nix collected "Baby A's urine to perform yet another toxicology screen,

and they were also collecting his meconium (fecal matter) to run additional toxicology tests at a lab outside of the hospital.  Ms. Costin did not consent to either of those tests.  Ms. Costin actively protested against Nurse Ranttila and Nurse Nix putting bags in place to collect her son's urine and fecal matter.  They told her she did not have a choice in the matter." Dkt. No. 14 at ¶ 41 (emphasis omitted).  Plaintiff also alleges that the second test of her own urine was negative for illicit substances which would not support additional testing.  *See id.* at ¶ 36.  At this stage of litigation, the Court concludes that allegations are sufficient to support Plaintiff's assertion that Defendant Ranttila engaged in a procedure.

At this early stage, without the benefit of any medical records for the Court to review, the Court must allow Plaintiff's medical malpractice claim to proceed.  Although quite attenuated, Plaintiff has alleged that Ranttila's conduct in removing Baby A from Plaintiff and taking Baby A's urine and fecal samples resulted in Plaintiff being unable to produce breastmilk which caused pain from cracked and bleeding skin.  *See* Dkt. No. 14 at ¶ 45.  Whether the nexus between Ranttila's conduct and Plaintiff's injuries exists must be determined through discovery and at the summary judgment or trial stage of the case.  Likewise, whether Ranttila's conduct in taking Baby A's fecal and urine samples without Plaintiff's consent constitutes a deviation from medical standards cannot be determined at the motion to dismiss stage.

Next, Defendant Ranttila contends that she cannot be held liable for Plaintiff not receiving an epidural because Defendant Ranttila contacted an anesthesiologist to get the process started and it was the Hospital that "was withholding the epidural." Dkt. No. 72-2 at 11.  She argues that Plaintiff has not plausibly alleged that Defendant Ranttila administered the Pitocin because the amended complaint states that other nurses connected the bag of fluids and that Nurse Ranttila, and the Hospital engaged in its provision.  *See id.*  Defendant Ranttila argues that under New

York law, "[i]t is the practitioner or midwife that determines a patient's care. Accordingly, nurses are not generally responsible for the administration of a medical treatment plan since it is beyond the scope of their duties." *Id.* at 11-12 (N.Y.C.R.R. § 405.21(13)(i)(A)).

Plaintiff recounts her allegations that it was Defendant Ranttila who told her that she would not be receiving an epidural and who squeezed the bag of Pitocin to accelerate Plaintiff's labor. *See* Dkt. No. 75 at 11 (citing Dkt. No. 14 at ¶¶ 34-37). Plaintiff argues that "even if other medical providers were involved, it does not excuse Defendant Ranttila's actions." *Id.* at 12.

"In order to establish proximate causation, a plaintiff must demonstrate that the defendant's deviation from the standard of care was 'a substantial factor in bringing about the injury.'" *Gonzalez v. United States*, 612 F. Supp. 3d 336, 345-46 (S.D.N.Y. 2020), *aff'd*, 80 F.4th 183 (2d Cir. 2023) (citation omitted). "[P]roximate cause . . . is ordinarily a question of fact for a jury." *Badilla v. Midwest Air Traffic Control Serv., Inc.*, 8 F.4th 105, 135 (2d Cir. 2021) (citing *Benitez v. N.Y.C. Bd. of Educ.*, 73 N.Y.2d 650, 659 (1989)). That is "'unless the court concludes that a reasonable jury could reach only one conclusion.'" *Martin v. City of New York*, 793 F. Supp. 2d 583, 586 (E.D.N.Y. 2011) (quoting *Packer v. Skid Roe, Inc.*, 938 F. Supp. 193, 196 (S.D.N.Y. 1996)). "In cases where there are 'independent intervening acts which operate upon but do not flow from the original negligence,' issues of proximate cause may be decided on a summary judgment motion." *Id.* (quoting *Derdiarian*, 51 N.Y.2d at 315).

Whether Defendant Ranttila's conduct was the proximate cause of Plaintiff's alleged injuries cannot be determined at the motion to dismiss stage. Rather, it is sufficient that Plaintiff has alleged that Defendant Ranttila was the nurse who "squeez[e]d on the bag" of Pitocin and informed Plaintiff she was receiving Pitocin which would accelerate her labor, to which Plaintiff protested. Dkt. No. 14 at ¶ 37. Plaintiff alleges that this conduct brought about the "violent birth"

of Baby A which resulted in injury to Baby A and Plaintiff. *Id.* at ¶ 38. A later stage of litigation is better suited to determine whether Plaintiff's alleged injuries were proximately caused by Defendant Ranttila's conduct or other intervening acts. Insofar as Defendant Ranttila identifies a New York law requiring a patient to be attended by a "licensed and currently registered obstetrician, family practitioner or licensed midwife," Dkt. No. 72-2 at 11, such a law does not negate the possibility that Defendant Ranttila's actions resulted in injuries to Plaintiff and/or Baby A.

As to whether Plaintiff has sufficiently alleged accepted standards of medical practice, Plaintiff specifically states in her complaint that Defendant Ranttila "deviated from accepted community standards of practice in the medical profession." Dkt. No. 14 at ¶ 88. Plaintiff explains that the Hospital's Bill of Rights promises Plaintiff the rights to refuse treatment, maintain confidentiality, participate in all decisions about her treatment, and be treated free from discrimination. *See* Dkt. No. 14 at ¶ 138. Plaintiff alleges that Defendant Ranttila deviated from those standards because she ignored Plaintiff's treatment refusals and discriminated against her for having a substance use disorder. *See id.* at ¶¶ 33-40. This is sufficient at this stage to state a medical malpractice claim based on a purported deviation from accepted medical practices. *See Rivera v. Fed. Bureau of Prisons*, No. 17-CV-05103, 2018 WL 11312146, *11 (S.D.N.Y. Dec. 14, 2018); *Estiverne v. Esernio-Jenssen*, 581 F. Supp. 2d 335, 350 (E.D.N.Y. 2008). Therefore, Defendant Ranttila's motion to dismiss the medical malpractice claim is denied.

### 2. Informed Consent

To establish a lack of informed consent claim, a plaintiff must allege "that '(1) the practitioner failed to disclose the risks, benefits and alternatives to the procedure or treatment that a reasonable practitioner would have disclosed[,] (2) a reasonable person in the plaintiff's

position, fully informed, would have elected not to undergo the procedure or treatment,' . . . and '(3) that the lack of informed consent is a proximate cause of the injury.'" *Rule v. Braiman, et al.*, No. 1:23-CV-01218, 2024 WL 4042135, *18 (N.D.N.Y. Sept. 4, 2024) (quoting *I.M. v. United States*, 362 F. Supp. 3d 161, 203 (S.D.N.Y. 2019); *Walker v. Saint Vincent Cath. Med. Centers*, 114 A.D.3d 669, 670 (2d Dep't 2014)).

Defendant Ranttila argues that Plaintiff fails to allege any conduct that required her to obtain Plaintiff's informed consent. *See* Dkt. No. 72-2 at 13. Defendant Ranttila contends that (1) Plaintiff requested the second urine analysis, (2) "collecting [Baby A's] urine and fecal samples alone does not constitute medical treatment that a patient 'undergoes' under the [Public Health Law]," (3) Plaintiff does not allege that the collection of Baby A's samples proximately caused any injury, (4) Defendant Ranttila did not make the decision to withhold the epidural, and (5) Plaintiff does not allege that Defendant Ranttila failed to disclose the risks and benefits concerning Pitocin and forceful inducement of labor. *Id.* at 13-15.

Plaintiff explains that her "claim against Defendant Ranttila for lack of informed consent is not based on any drug tests—it is based on Defendant Ranttila's provision of Pitocin to [Plaintiff] and forcing [Plaintiff] to undergo labor without an epidural." Dkt. No. 75 at 14. Plaintiff argues that she "did, in fact, allege that Defendant Ranttila withheld the epidural," that forcing labor is performance of a procedure, and that Defendant Ranttila did not disclose any risks associated with the use of Pitocin to induce labor without an epidural. *Id.* at 14-15.

Plaintiff has sufficiently alleged a lack of informed consent claim. Defendant Ranttila does not dispute that labor is a procedure under New York's Public Health Law. Rather, she argues that Plaintiff did not allege anything about the disclosure of risks, benefits, and alternatives to an induced labor. *See* Dkt. No. 72-2 at 15. Plaintiff's amended complaint belies this contention

by explicitly alleging that Plaintiff was entitled to know the risks, complications, and alternatives concerning the birth process and that Defendant Ranttila did not obtain Plaintiff's informed consent to induce labor without an epidural. *See* Dkt. No. 14 at ¶¶ 103, 105. Plaintiff alleges that "[a] reasonably prudent person in [Plaintiff's] position would not have agreed to this procedure if fully informed, as demonstrated by her constant pleas for an epidural and her objections to the Pitocin injection without the epidural." *Id.* at ¶ 105.

Additionally, contrary to Defendant Ranttila's argument, *see* Dkt. No. 72-2 at 14, Plaintiff does not allege only a failure to undertake a procedure. She also asserts that Defendant Ranttila affirmatively acted by inducing labor with the use of Pitocin and without telling Plaintiff any of the risk, benefits, or alternatives associated with induction. *See* Dkt. No. 14 at ¶¶ 37-38, 105. This is sufficient at this stage to allege a lack of informed consent claim. *See Guinn v. New York Methodist Hosp.*, 212 A.D.3d 787, 789 (2d Dep't 2023); *Cicione v. Meyer*, 33 A.D.3d 646, 648 (2d Dep't 2006); *Cerny v. Williams*, 32 A.D.3d 881, 886 (2d Dep't 2006). As such, this aspect of the motion to dismiss is denied.

### 3. Emotional Distress

Defendant Ranttila contends that Plaintiff cannot bring her intentional or negligent infliction of emotional distress claims because they are duplicative of other traditional tort liability claims. *See* Dkt. No. 72-2 at 15. Alternatively, she argues that Plaintiff fails to allege extreme and outrageous conduct sufficient to state an intentional infliction of emotional distress claim. *See id.* at 16. Finally, Defendant Ranttila avers that Plaintiff has not alleged any conduct that unreasonably endangered Plaintiff's physical safety or caused her to fear for her safety, which defeats her negligent infliction of emotional distress claim. *See id.* at 18.

Plaintiff avers that her emotional distress claims should not be dismissed as duplicative of her other tort claims because she is entitled to plead alternative theories of relief. *See* Dkt. No. 75 at 16. Plaintiff also contends that she has sufficiently alleged extreme and outrageous conduct. *See id.* at 16-17. Finally, Plaintiff argues that she has sufficiently alleged negligent conduct through Defendant Ranttila's forceful induction of Plaintiff's labor without Plaintiff's consent. *See id.* at 17-18.

"[A]n intentional infliction of emotional distress claim . . . requires a showing of: (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Cross v. State Farm Ins. Co.*, 926 F. Supp. 2d 436, 451 (N.D.N.Y. 2013) (citing *Conboy v. AT & T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001); *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999)). "There can be liability under this tort only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Id.* (citation omitted).

Accepting Plaintiff's allegations as true, as the Court must at the motion to dismiss stage, she has alleged extreme and outrageous conduct. She alleges that she begged for an epidural, which was denied, and was forced into labor through the administration of Pitocin which she was not informed of until it was too late. This resulted in a vaginal tear and Baby A had "a completely bruised face, and the blood vessels in both of his eyes were burst." Dkt. No. 14 at ¶ 38. Relying solely on these facts, this is purportedly extreme and outrageous conduct.

Next, "'[t]o plead a negligent infliction of emotional distress claim under New York law, a plaintiff must allege (1) a breach of a duty owed to the plaintiff; (2) emotional harm; (3) a direct

causal connection between the breach and the emotional harm; and (4) circumstances providing some guarantee of genuineness of the harm.'" *Johnson v. New York State Police*, 659 F. Supp. 3d 237, 261 (N.D.N.Y. 2023) (quoting *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 81 (2d Cir. 2021)).  One way "in which a plaintiff can guarantee the genuineness of the harm" is by "showing that the defendant's breach of its duty unreasonably endangered the plaintiff's physical safety, which requires a physical injury or the threat of danger, either to the plaintiff . . . or to a close family member . . . ." *Doe v. Ithaca College, et al.*, No. 3:23-CV-1600, 2024 WL 4135714, *18 (N.D.N.Y. Sept. 10, 2024) (quoting *Potrzeba v. Sherburne-Earlville High Sch.*, 23-CV-0191, 2023 WL 8827178, *12 (N.D.N.Y. Dec. 21, 2023)) (quotation marks omitted).

"Under the direct duty theory, a plaintiff must allege that 'she suffer[ed] an emotional injury from defendant's breach of a duty which unreasonably endangered her own physical safety.'" *Truman v. Brown*, 434 F. Supp. 3d 100, 123 (S.D.N.Y. 2020) (quoting *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996)).  "This duty 'must be specific to the plaintiff, and not some amorphous, free-floating duty to society.'" *Id.* (quotation omitted).  "The direct duty theory also requires 'an objective inquiry turning on whether a plaintiff's physical safety was actually endangered, not a subjective evaluation dependent on the plaintiff's state of mind." *Id.* (quotation omitted).[3]

---

[3] Courts appear to be split on whether extreme and outrageous conduct is an essential element of a negligent infliction of emotional distress claim, with most courts answering the question in the negative.  *See Xenias v. Roosevelt Hosp.*, 180 A.D.3d 588, 589 (2020); *Ben v. United States*, 160 F. Supp. 3d 460, 484 (N.D.N.Y. 2016); *Veras v. New York City Dep't of Educ.*, No. 1:22-CV-00056, 2024 WL 3446498, *6 (S.D.N.Y. July 17, 2024); *Doe v. Langer*, 206 A.D.3d 1325, 1331 (3d Dep't 2022).  However, the Court need not decide at this juncture whether extreme and outrageous conduct is an essential element of a negligent infliction of emotional distress claim because, either way, Plaintiff's complaint satisfies the Rule 12(b)(6) standard.  If it is a required element, as set forth above, Plaintiff has sufficiently alleged extreme and outrageous conduct.  If it is not a necessary element, Plaintiff has sufficiently alleged that Defendant Ranttila engaged in conduct that unreasonably endangered Plaintiff's and Baby A's physical safety.

Plaintiff alleges that Nurse Ranttila withheld an epidural, provided no pain relief, and induced labor using Pitocin such that Plaintiff "pushed Baby A out with such force that several inches of [Plaintiff's] body were ripped open during delivery.  Due to the violent nature of Baby A's birth, Baby A exited the birth canal with a completely bruised face, and the blood vessels in both of his eyes were burst."  Dkt. No. 14 at ¶ 39.  Plaintiff's "untreated pain during her first skin-to-skin contact with Baby A was so severe that she was quivering and barely had the strength to hold him."  *Id.* at ¶¶ 38-29.  Accepting these allegations as true, this is sufficient to allege that, objectively, Plaintiff's and Baby A's physical safety were endangered.

Finally, "'where the conduct complained of falls well within the ambit of other traditional tort liability,' the New York Court of Appeals 'has cautioned that a claim for [intentional infliction of emotional distress] may not be sustainable.'"  *Doe v. AR*, No. 21-CV-06353, 2022 WL 1624081, *11 (W.D.N.Y. May 23, 2022) (quoting *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 159 (2d Cir. 2014)).  "This is so because the 'clear purpose' of an [intentional infliction of emotional distress] claim 'is to supplement existing forms of recovery by providing a cause of action for egregious conduct that might otherwise go unremedied.'"  *Id.* (quoting *Turley*, 774 F.3d at 159 n.18).  "'Federal courts in the Second Circuit agree that no intentional infliction of emotional distress claim will lie where the conduct underlying the claim falls within the ambit of traditional tort liability.'"  *Pateman v. City of White Plains*, No. 17-CV-6156, 2020 WL 1497054, *25 (S.D.N.Y. Mar. 25, 2020) (collecting cases); s*ee also Schoolcraft v. City of New York*, 103 F. Supp. 3d 465, 540 (S.D.N.Y.), *on reconsideration in part*, 133 F. Supp. 3d 563 (S.D.N.Y. 2015) (dismissing intentional infliction of emotional distress claim as duplicative of medical malpractice claim); *Koulkina v. City of New York*, 559 F. Supp. 2d 300, 328 (S.D.N.Y. 2008); *Richardson v.*

*City of New York*, No. 15-CV-543, 2015 WL 7752143, *19 (S.D.N.Y. Nov. 18, 2015) (same);

*Virgil v. Darlak*, No. 10-CV-6479, 2013 WL 4015368, *10 (W.D.N.Y. Aug. 6, 2013) (same).

The Court will not dismiss Plaintiff's claims as duplicative at this time because she is

entitled to plead claims under alternative theories of liability. *See Maldonado v. Town of*

*Greenburgh*, 460 F. Supp. 3d 382, 402 (S.D.N.Y. 2020) ("In the Second Circuit, there is no

requirement that the alternative pleadings be made in a technical form,' i.e., that the pleading

needs to be explicit about pleading in the alternative") (quotation and quotation marks omitted);

*see also McCarthy v. Mario Enterprises, Inc.*, 163 A.D.3d 1135, 1137 (3d Dep't 2018).

Therefore, this aspect of Defendant Ranttila's motion to dismiss is denied.

## IV. CONCLUSION

Upon careful consideration of the entire record in this matter, the parties' submissions and

the applicable law, and for the reasons set forth herein it is hereby

**ORDERS** the Defendant Ranttila's motion to dismiss (Dkt. No. 72) is **DENIED**; and the

Court further

**ORDERS** that Defendant Bennett's motion to dismiss (Dkt. No. 73) is **DENIED**; and the

Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on all

parties in accordance with Local Rules.

**IT IS SO ORDERED.**

Dated: December 4, 2024
        Albany, New York

Mae A. D'Agostino
U.S. District Judge